*Kenwood Gardens Condominiums, Inc., v. Whalen Properties, LLC*, No. 86, September Term, 2015.  Opinion by Greene, J.

**ADMINISTRATIVE LAW — PLANNING AND ZONING — PLANNED UNIT DEVELOPMENTS — LEGISLATIVE INTENT**

The courts ordinarily do not review the motives of the Legislature when reviewing a legislative enactment unless the evidence establishes that the government body or actor was acting outside its legal boundaries. Actions of a local government body that are legislative in nature, as opposed to quasi-judicial or adjudicative, are subject to a more limited review. The planned unit development approval process in Baltimore County requires both legislative and adjudicative processes, which involve separate standards for judicial review.  The Baltimore County resolution at issue was a legislative act and thus not subject to ordinary judicial review beyond the limited inquiry of whether the County Council was acting within its legal authority in adopting the resolution.  As such, the Board of Appeals was correct in concluding that it and the Administrative Law Judge lacked the authority to review an alleged appearance of impropriety in the initiation process underlying the resolution.

Circuit Court for Baltimore County
Case No. 03-C-13-7229
Argued: May 4, 2016

IN THE COURT OF APPEALS

OF MARYLAND

No. 86

September Term, 2015

_____

Kenwood Gardens Condominiums, Inc., *et al.*

v.

Whalen Properties, LLC

_____

Barbera, C.J.
Greene,
Adkins,
McDonald,
Watts,
Hotten,
Battaglia, Lynne A., (Retired, Specially Assigned),

JJ.

_____

Opinion by Greene, J.

_____

Filed: August 19, 2016

The Baltimore County zoning regulations create a Planned Unit Development ("PUD")[1] approval process that is partly legislative and partly quasi-judicial or adjudicative in nature. The instant case arises from a dispute over the approval of a PUD application in Baltimore County. Petitioners, Kenwood Gardens Condominiums, Inc., *et al.* ("Kenwood"), allege that the PUD developer made illegal campaign contributions to the county councilman who formally accepted the PUD application submitted by the developer. Respondent, Whalen Properties, LLC ("Whalen Properties"), the developer, submitted the PUD application on August 9, 2011, to First District Councilman Thomas Quirk ("Councilman Quirk") of Baltimore County. The proposed site for the PUD is located in Councilman Quirk's legislative district. On August 30, 2011, Stephen Whalen, Jr., owner and principal of Whalen Properties, withdrew $8,500 from the company's account and subsequently distributed this money to several individuals, who were instructed to deposit the sums into their own accounts and to write checks in those amounts to the campaign committee, Friends of Thomas Quirk.[2]

---

[1] Pursuant to zoning regulations:
> A "planned unit development" (PUD) is a development in which residential and/or commercial uses are approved subject to restrictions calculated to achieve the compatible and efficient use of land, including the consideration of any detrimental impact upon adjacent residential communities.

Baltimore County Zoning Regulations, Art. 4, Section 430.1.

[2] No criminal charges were ever brought against Councilman Quirk. It appears that on January 3, 2013, Mr. Whalen, in a separate criminal proceeding, pleaded guilty to five counts of violating Maryland campaign finance laws. The statement of facts offered to support the guilty pleas revealed a series of email communications between Mr. Whalen and Councilman Quirk discussing campaign contributions and the PUD application. Contained within the written statement of facts, the State Prosecutor specifically stated "[n]o evidence was uncovered indicating that Councilman Quirk or his campaign officers were aware that the three checks . . . were anything other than independent contributions

Kenwood is an adjacent landowner who challenges the approval of the PUD on the appearance of impropriety generated by the donations. We conclude that because the introduction and passage of a resolution is a legislative action, the legislative intent is subject to limited judicial review. In addition, the alleged "appearance of impropriety" generated by illegal campaign contributions does not negate the presumption of validity of the legislative act.

## FACTUAL AND PROCEDURAL BACKGROUND

Pursuant to Article 32, Title 4, Subtitle 2, §§ 32-4-242–402.1 (2003, 2012 Supp.) of the Baltimore County Code ("BCC"),[3] the PUD approval process in Baltimore County begins with the submission of an application to the county councilman for the district in which the proposed PUD is to be located. BCC § 32-4-242(a). The application is subsequently incorporated into a County Council Resolution. Substantive review of the application may not proceed unless the County Council passes the resolution. Following the passage of the resolution, the application undergoes an extensive review and approval process by various Baltimore County planning and zoning agencies before concluding in a final public hearing before an administrative law judge ("ALJ").

---

by those three individuals to the Quirk campaign." Mr. Whalen made the contributions a few weeks before Councilman Quirk introduced Resolution No. 108-11 to the County Council. Upon submission of the application, "[n]otice of the proposed project was posted, and a community meeting was held on September 1, 2011 to present the project and allow community input."

[3] All citations to the Baltimore County Code refer to the 2003 Edition unless otherwise stated herein.

On August 9, 2011, Whalen Properties submitted a PUD application to Councilman Quirk for a seven story mixed-use medical services building. Notice of the PUD was posted and a community input meeting was held on September 1, 2011. On September 19, 2011, Councilman Quirk introduced Resolution 108-11, which contained the PUD proposal. The County Council unanimously approved the Resolution on October 17, 2011. Whalen Properties met with Baltimore County agencies on October 24, 2011 and October 29, 2011 to review the concept plan and held a community input meeting on December 22, 2011 "to solicit detailed comments from local community members."

On June 6, 2012, approximately eight months after the County Council adopted Resolution 108-11, the Council enacted Bill 38-12, which exempted PUDs in certain areas of Baltimore County from traditional compatibility standards under the zoning regulations and substituted a more lenient set of compatibility objectives for all qualifying future PUD applications. Kenwood alleges this is evidence of an improper "special law."[4] On June 8, 2012, Whalen Properties filed a finalized development plan, which it reviewed with Baltimore County on August 1, 2012.

Pursuant to BCC § 32-4-245(b) (2003, 2012 Supp.), a Hearing Officer, hereinafter designated as an ALJ, is required to "review the proposed [PUD] for compliance with the

---

[4] A special law is "one that relates to particular persons or things of a class, as distinguished from a general law which applies to all persons or things of a class." *Cities Servs. Co. v. Governor*, 290 Md. 553, 567 (1981) (quoting *Prince George's Cnty. v. B. & O. R. Co.*, 113 Md. 179, 183 (1910)). The Maryland Constitution prohibits the General Assembly from passing special laws, and this prohibition flows through to Baltimore County via the Express Powers Act. *See* Md. Const., Art. III § 33; Md. Code (1974, 2013 Repl. Vol.), § 10-202 of the Local Government Article ("LG").

requirements of the Baltimore County zoning regulations and the development regulations." The ALJ's review is narrow and fact-specific. Between August 22, 2012 and December 3, 2012, an ALJ conducted five days of public administrative hearings on the PUD development plan and approved the PUD on January 29, 2013.[5]

Kenwood challenged the proposed PUD at the hearing before the ALJ and subsequently at the hearing before the Baltimore County Board of Appeals ("Board of Appeals" or "the Board"). The ALJ rejected Kenwood's challenge that the alleged appearance of impropriety was reviewable or invalidated the process. Kenwood appealed the ALJ's approval of the PUD to the Board of Appeals. *See* BCC § 32-4-281(a), (c) and (d) (2016) ("The Board of Appeals shall hear the appeals in accordance with the rules of procedure adopted by the Board of Appeals"). Following a review of the ALJ's decision, the Board may:

(i) Remand the case to the ALJ;
(ii) Affirm the decision of the ALJ; *or*

_____

[5] Section 32-4-245(c)(1)-(c)(5) provides that an ALJ may approve a proposed PUD development plan upon finding that:
(1) The proposed development meets the intent, purpose, conditions, and standards of this section;
(2) The proposed development will conform with Section 502.1.A,B,C.D,E and F of the Baltimore County Zoning Regulations and will constitute a good design, use and layout of the proposed site;
(3) There is a reasonable expectation that the proposed development, including development schedules contained in the PUD development plan, will be developed to the full extent of the plan;
(4) Subject to the provisions of § 32-4-242(c)(2), the development is in compliance with Section 430 of the Baltimore County Zoning Regulations; and
(5) The PUD development plan is in conformance with the goals, objectives, and recommendations of one or more of the following: the Master Plan, area plans, or the Department of Planning.

(iii) Reverse or modify the decision of the ALJ if the decision:
1. Exceeds the statutory authority or jurisdiction of the ALJ;
2. Results from an unlawful procedure;
3. Is affected by any other error of law;
4. Is supported by competent, material, and substantial evidence in light of the entire record as submitted; or
5. Is arbitrary and capricious.

BCC § 32-4-281(e) (emphasis added).

On June 7, 2013, the Board of Appeals affirmed the decision of the ALJ. The decision to affirm the ALJ's approval of the proposed PUD was the agency's final decision in the matter. The Board agreed with the ALJ and concluded that any alleged improper motivation underlying the actions by the County Council was beyond the permitted scope of review. Kenwood sought judicial review in the Circuit Court for Baltimore County. The Circuit Court reviewed the record and arguments presented by the parties and affirmed the decision of the Board of Appeals. The Circuit Court concluded, however, that the passage of Resolution No. 108-11 constituted a quasi-judicial action rather than legislative action because the County Council's process with regard to the "resolution for the PUD [wa]s focused upon the analysis of factors relating to a single property." Notwithstanding that conclusion, the Circuit Court recognized that "[t]he issue for judicial review is not how the process for a PUD review was initiated" and that "[t]he focus is [on] whether the substance of the administrative review process was fair, and whether the decision to approve the PUD complied with the law and was supported by the evidence."

Kenwood noted a timely appeal to the Court of Special Appeals. In an unreported opinion, the Court of Special Appeals affirmed the judgment of the Circuit Court. It held that the ALJ's decision did not exceed his statutory authority or result from an unlawful

- 5 -

procedure or other error of law and that the ALJ's findings were supported by substantial evidence in the record.

Kenwood filed a petition for writ of certiorari. We granted *certiorari*. *Kenwood Gardens Condo. v. Whalen Properties*, 446 Md. 218, 130 A.3d 507 (2016). Kenwood raised multiple overlapping questions in its petition, which revolve around whether the alleged appearance of impropriety generated by the campaign donations invalidates Whalen's submission of the PUD application to Councilman Quirk and whether the County Council's development process for approval of the PUD is subject to judicial review and the scope of that review. We have condensed and restated these issues for the purposes of clarity and concision:[6]

---

[6] Kenwood presented the following questions:

> 1. Does the administrative agency here, the County Board of Appeals have the authority and responsibility to review whether a serious and extraordinary "appearance of impropriety["] poisons, taints, and invalidates a County Council Resolution approving the initiation of a favorable Planned Unit Development (PUD) Zoning process consistent with its responsibility to review all procedural and constitutional issues per *Prince George's County v. Ray's Used Cars*, 398 Md. 632 (2007)[?]

> 2. Is there a serious and extraordinary problem of "appearance of impropriety" when there is an undisputed e-mail record linking the PUD Developer's illegal campaign contributions to the County Council member with the Council member[']s sponsoring of the PUD resolution?

> 3. Pursuant to the Baltimore County Charter Section, 1009 and the Maryland case law, (*Overpak*) is the County Council's adoption of a PUD Resolution as to this specific property here substantially an administrative action, even though not the final action in the process, and so clearly reviewable for an extraordinarily serious "appearance of impropriety"?

1. Does the alleged impropriety or the alleged appearance of impropriety affect Councilman Quirk's legislative ability to introduce or vote on Resolution 108-11 under Article 7, Title 1, Subtitle 3, § 7-1-301 (2003, 2011 Supp.) of the Baltimore County Code?

2. Does the alleged appearance of impropriety invalidate Bill 38-12 as an improper "special law", specifically designed to assist Respondent's PUD application?

## STANDARD OF REVIEW

In reviewing the final decision of an administrative agency, such as the Board of Appeals, we look "through the circuit court's and intermediate appellate court's decisions, although applying the same standards of review, and evaluate the decision of the agency." *People's Counsel for Balt. Cnty. v. Loyola Coll.*, 406 Md. 54, 66, 956 A.2d 166, 173 (2008) (quoting *People's Counsel for Balt. Cnty. v. Surina*, 400 Md. 662, 681, 929 A.2d 899, 910 (2007)).  Our scope of review is narrow and "is limited to determining whether there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous

---

4. Consistent with *County Council for Montgomery County v. District Land Corp.*, 274 Md. 691 (1975), even if County Council Resolution #108 is, or properly is described by the Court of Special Appeals as legislative in character, [is it] still subject to review where there is undisputed evidence of an extraordinary "impropriety" which the reviewing administrative agencies, and [the] Court of Special Appeals all criticized and said should not be condoned?

5. Is the "appearance of impropriety" compounded where a County Council member mentioned in the State Prosecutor's Statement of Facts, also raising dollars for an election campaign and then followed up the PUD resolution by sponsoring and facilitating the approval of legislation (Bill 38-12), which relaxed the long-standing relevant compatibility standard applicable particularly to this PUD, and favoring it in a way which had no rational relationship to compatibility?

conclusion of law." *Md. Aviation Admin. v. Noland*, 386 Md. 556, 571, 873 A.2d 1145, 1154 (2005). We defer to the regulatory body's fact-finding and inferences, provided they are supported by evidence which a reasonable person could accept as adequately supporting a conclusion. *Surina*, 400 Md. at 681, 929 A.2d at 910 (quotation marks and citation omitted). However, if we determine that the agency's decision is based on an erroneous conclusion of law, no deference is given to those conclusions. *Surina*, 400 Md. at 682, 929 A.2d at 911. "[E]ven though the decision of the Board of Appeals was based on the law, its expertise should be taken into consideration and its decision should be afforded appropriate deference in our analysis of whether it was 'premised upon an erroneous conclusion of law.'" *Marzullo v. Kahl*, 366 Md. 158, 173, 783 A.2d 169, 178 (2001) (citing *Bd. of Physician Quality Assurance v. Banks*, 354 Md. 59, 68, 729 A.2d 376, 380 (1999)).

## DISCUSSION

### The PUD Process

Land use in Baltimore County draws upon overlapping Baltimore County Code provisions originating from a statutory grant under two separate Articles of the Maryland Code. *See* LG § 5-203 and § 5-213 (formerly Articles 23A and 25) (granting to municipalities legislative powers to adopt zoning regulations); LG § 10-102(b) and § 10-324 (same with respect to charter counties and code counties); and Md. Code (2012), Division I, Land Use Article ("LU") (formerly Art. 66B) (regarding planning and zoning in counties and municipalities). *See also Mayor & Council of Rockville v. Rylyns Enters., Inc.*, 372 Md. 514, 528 n.3, 814 A.2d 469, 477 n.3 (2002) ("[t]racing the entire panoply of

- 8 -

related enabling statutes in Maryland"); *Cnty. Council of Prince George's Cnty. v. Zimmer Dev. Co.*, 444 Md. 490, 502, 120 A.3d 677, 683 (2015) (providing "[a] [m]ind-[n]umbing [p]rimer . . . in the mysteries of land use regulation").

"Modern zoning ordinances . . . strive to meet society's current development needs by providing greater flexibility in zoning patterns." *Rouse-Fairwood Dev. Ltd. P'ship v. Supervisor of Assessments for Prince George's Cnty.*, 138 Md. App. 589, 623, 773 A.2d 535, 555 (2001) (internal quotations omitted). A PUD is a planning tool employed to allow increased flexibility in the land development process. *See Md. Overpak Corp. v. Mayor and City Council of Balt.*, 395 Md. 16, 22 n.4, 909 A.2d 235, 238 n.4 (2006) ("*Overpak*"). Courts have recognized:

> A planned unit development, or PUD, is the development of a tract of land as a single entity which may include dwellings of various types, commercial uses, and sometimes industrial uses . . . Such a planned unit "enables the builder to create, within the confines of a single development, a variety of housing types which . . . will [enhance] the possibilities of attractive environmental design and [provide] the public with open spaces and other common facilities." The PUD "is a legislative response to changing patterns of land development and the demonstrated shortcomings of orthodox zoning regulations . . . Currently, the improvement of land is in control of developers who assemble large tracts and improve the land for resale or rental. Given this modern pattern of land development, planners and legislators conceived a technique of land-use control which was better adapted to the realities of the marketplace." . . . Planned unit developments make it possible "to insure against conflicts in the use of land while permitting a mix of use in a single district." . . . The PUD concept "has freed the developer from the inherent limitations of the lot-by-lot approach and thereby promoted the creation of well-planned communities."

*See Rouse-Fairwood Dev. Ltd. P'ship*, 138 Md. App. at 624, 773 A.2d at 555–56 (quoting *Woodhouse v. Bd. of Comm'rs*, 261 S.E.2d 882, 891 (N.C. 1980) (citations omitted)).

The Baltimore County Master Plan 2020 provides:

- 9 -

The [PUD] represents an alternative development approval process that increases and specifies benefits to the immediate community that the PUD will impact, in exchange for an enhanced plan . . . Under the PUD process, redevelopment can occur in forms not permitted by the standard application of the [extant] zoning and development regulations. The PUD process can streamline the review process for projects that utilize a site efficiently, are compatible within the community and demonstrate a high degree of design, quality, materials and finish. The flexibility provided by the PUD process makes it an important tool to react to the changing market needs and conditions in the County, and this vital function should be maintained.

*Baltimore County Master Plan 2020*, BALTIMORE COUNTY COUNCIL (Nov. 2010), http://resources.baltimorecountymd.gov/Documents/Planning/masterplan/masterplan2020.pdf [https://perma.cc/5H4M-BV7M].

Although PUD evaluations contain elements of comprehensive zoning by considering broad policy concerns, they do so only in relation to the specific property being evaluated. In Baltimore County, the evaluation of a PUD application is initiated by the introduction of a resolution for consideration by the County Council. BCC § 32-4-242. Article 32, Title 4, Subtitle 2, Part IV of the BCC sets forth the scheme for evaluating and approving PUDs in that County. In 2005, the County Council passed Bill No. 130-2005 and changed the PUD application process. Prior to the enactment of Bill No. 130-2005, developers applied directly to the County Planning and Zoning Commission. Currently, the process of obtaining a PUD begins by submitting an application to the councilman responsible for the district in which the proposed PUD will be located. BCC § 32-4-242(a). The application requires the developer to submit the following: a map of the project site with an explanation of how the site and acreage meet the criteria for the type of PUD proposed; architectural schematics indicating the use, size, and location of the proposed

structures; comparison of the present existing and the proposed future population density, floor area ratio, and parking spaces; the projected impact on the surrounding community; and a statement of compatibility with the requirements listed in BCC § 32-4-402. BCC § 32-4-242(b)(1)–(5). Additionally, the application must also list the community benefits that the PUD will provide, including environmental, land use, capital improvement, and public policy benefits. BCC § 32-4-242(b)(6)(i)–(iv). The application is required to be posted on the County Council website, and a community meeting must be held. Notice of the meeting must be posted and mailed to all adjoining property owners. BCC § 32-4-242(c)(2)(i)(1). The councilmember has the discretion to schedule a second post-submission community meeting.

After the councilmember submits the application to the Department of Permits, Approvals and Inspections, that Department transmits the application to the Departments of Planning, Public Works, Environmental Protection and Sustainability and other appropriate reviewing agencies for preliminary review and comment. The reviewing county agencies must provide a written preliminary evaluation of the proposal to the Council member within fifteen days of the filing of a PUD application. BCC §32-4-242(c)(3). Each department reviews the application and posts the preliminary evaluation on the county's internet website. *Id*. Following this preliminary evaluation, the matter of the PUD application is then referred to the full County Council in the form of a Resolution for action.

If the Council concludes that the proposed PUD will achieve a development of substantially higher quality than a conventional development would achieve, and that the

- 11 -

proposed site for the PUD is in accordance with the procedures of this title as well as the requirements of the zoning regulations, then the proposed site is "eligible for County review." BCC § 32-4-242(d)(1). After the adoption of a resolution, the Council is required to give public notice of the resolution and the Department of Permits, Approvals and Inspections is required to post the property within ten business days of a final vote on the resolution. *See* BCC § 32-4-242(d)(1), (3)(iii).

Approval by the County Council is not final acceptance of the PUD. Following the passage of the resolution, the developer is required to participate in an informational concept plan conference with the reviewing county agencies. BCC § 32-4-243(a) (2003, 2012 Supp.). Following the informational concept plan conference, the developer must file a finalized PUD development plan. The County agencies then undertake review of and prepare comments for the finalized development plan. BCC § 32-4-243(e). The Department of Planning prepares a finalized report, which "together with the [PUD] and pattern book[7] shall be submitted to the [ALJ] for review[.]" BCC § 32-4-244 (2003, 2011 Supp.). The ALJ reviews the proposed PUD for compliance with the requirements of the Baltimore County Zoning Regulations and issues a written approval or denial of the PUD. BCC § 32-4-245. Final action on a development plan may not be taken until after a public "quasi-judicial" hearing before an ALJ. BCC § 32-4-227(a) (2016).

---

[7] A pattern book is a formal submission of the project details and specifications. *Pattern Book List*, BALTIMORE COUNTY DEPARTMENT OF PLANNING (May 2016), http://resources.baltimorecountymd.gov/Documents/Planning/PatternBookChecklist.pdf [https://perma.cc/9M3D-BWDN].

## The Parties' Contentions

Kenwood contends that the Board of Appeals erroneously upheld the approval of the PUD application because Councilman Quirk's involvement with Mr. Whalen created an "appearance of impropriety" and tainted the application process. Further, Kenwood maintains that the County Council's process for the introduction and adoption of Resolution 108-11 was substantially administrative or adjudicatory in nature and thus subject to judicial review on the grounds of an "appearance of impropriety." According to Kenwood, an "appearance of impropriety" exists when there is an undisputed email record indicating that Mr. Whalen made illegal campaign contributions to Councilman Quirk, the sponsor of the PUD resolution. Conceding that the County Council serves a gatekeeping function in the PUD approval process, Kenwood contends that this function involves making a significant amount of specific factual findings to evaluate a particular PUD proposal.

As an alternative argument, Kenwood suggests that even if Resolution 108-11 is legislative in nature, it is nonetheless subject to judicial review, because there is undisputed evidence of extraordinary impropriety in the PUD approval process. Kenwood relies upon several out-of-state cases to support its conclusion that Councilman Quirk created a conflict of interest that infected the entire PUD application process, and argues that the only way to remove the taint of his involvement is for this Court to "void the resolution and resulting PUD approval." Moreover, according to Kenwood, the "appearance of impropriety" is compounded by the County Council's passage of Bill 38-12, a legislative act, which, in

Kenwood's view, is linked to other favorable council actions to facilitate the approval of the Whalen Properties PUD application.

Whalen Properties sees the case differently. It contends that the introduction and adoption of Resolution 108-11 was a legislative act subject to very narrow judicial review. It maintains that the alleged improper motives underlying the passage of Resolution 108-11 are irrelevant to the PUD application process, because the resolution relates primarily to general policy-oriented considerations, such as environmental concerns, employment and economic opportunities, and unique characteristics relating to the site of Whalen Properties' proposed PUD. In addition, Whalen Properties posits that the passage of Resolution 108-11 was not quasi-judicial because no hearings were held by the Council to consider documentary evidence or opinions in order to pass the Resolution. According to Whalen Properties, the processes employed by the ALJ and the Board of Appeals were rigorous. The ALJ engaged in a substantive review process that included five days of on the record hearings. The Board of Appeals engaged in a detailed review of the administrative record.

Whalen Properties asserts that neither the Board of Appeals nor the ALJ had the authority to scrutinize Resolution 108-11 as long as the Council acted within its legal bounds in passing the legislation. Whalen Properties points out that the County Council's process involved a separate proceeding which began with Councilman Quirk's introduction of the Resolution. The approval process that involved the ALJ and the Board did not include Councilman Quirk or the County Council. Finally, Whalen Properties argues that Kenwood's reliance on several out-of-state cases, in an attempt to create an exception to

the general rule that legislative motives are not subjective to judicial inquiry, is not persuasive.

**Legislative Nature of the Process and the Appearance of Impropriety**

The relevant sections of the BCC regarding the PUD process specifically note that the application must be submitted to the councilman responsible for the district in which the proposed PUD is located. BCC § 32-4-242(a). Because the Code expressly provides that submission to the councilman is the correct channel and does not provide for alternative means of initiating the PUD process, it follows that Councilman Quirk was the only individual authorized by law to act in accepting Whalen Properties' PUD application.

Kenwood asserts, however, that the introduction and passage of Resolution 108-11 was administrative and quasi-judicial in character, and therefore, is reviewable for impropriety. To the contrary, Whalen Properties contends that the County Council performed a legislative action, which is not subject to review for motive. It is most noteworthy that we have previously held that "a single decision-making process may require both legislative and adjudicative roles for the hearing body." *Talbot Cnty. v. Miles Point Prop., LLC*, 415 Md. 372, 391, 2 A.3d 344, 355 (2010). *See also Mayor & Council of Rockville v. Woodmont Country Club*, 348 Md. 572, 584–85, 705 A.2d 301, 306–07 (1998) (concluding enacting special assessments may include both adjudicative and legislative aspects). Here, the process by which a PUD application is approved involves action by both the County Council and further review by the ALJ; the former is legislative and the latter is quasi-judicial.

- 15 -

We hold that the introduction of Resolution 108-11 was a legislative act in nature premised on a threadbare recital of relevant facts as submitted by the developer and evaluated on general, policy-based grounds. Resolution 108-11 was a preliminary finding of eligibility that allowed for the continued review of the PUD proposal by the County. Specifically, as the Circuit Court pointed out below,

> [t]he resolution for the PUD in this case merely initiated a substantive review process. The decision to approve the PUD was the culmination of several agency reviews, community input, plan revisions, and a contested evidentiary hearing before a neutral and independent ALJ, which was then substantively reviewed by the Board.

We recognize in analyzing the PUD review process in Baltimore County that an action is legislative or quasi-judicial in nature depending on the factual evaluation used.

In *Overpak*, 395 Md. at 33, 909 A.2d at 245, we recounted the standard for determining whether an act is legislative or quasi-judicial in nature:

> The outcome of the analysis of whether a given act is quasi-judicial in nature is guided by two criteria: (1) the act or decision is reached on individual, as opposed to general, grounds, and scrutinizes a single property; and (2) there is a deliberative fact-finding process with testimony and the weighing of evidence.

We explained in *Overpak* that ordinarily, "proceedings or acts that scrutinize individual parcels or assemblages for the consideration of property-specific proposed uses, at the owner's or developer's initiative, suggest a quasi-judicial process or act." 395 Md. at 37, 909 A.2d at 247. These individualized determinations are to be distinguished "from acts that primarily have broader, community-wide implications, which encompass considerations affecting the entire planning area or zoning district." *Overpak*, 395 Md. at 36, 909 A.2d at 246.

The second element of the test ordinarily involves "the holding of a hearing, the receipt of factual and opinion testimony and forms of documentary evidence, and a particularized conclusion as to the development proposal for the parcel in question." *Overpak*, 395 Md. at 38, 909 A.2d at 248. Accordingly, "site-specific findings of fact are necessary not only to inform properly the interested parties of the grounds for the body's decision, but also to provide a basis upon which judicial review may be rendered." *Overpak*, 395 Md. at 40, 909 A.2d at 249 (internal citations omitted). We pointed out in *Overpak* that the "most weighty criterion" is the fact-finding. 395 Md. at 33, 909 A.2d at 245.

Further, in *Overpak*, we concluded that the Baltimore City Council's amendment of a previously-approved PUD amounted to quasi-judicial rather than legislative action, because the amendment dealt with a specific property and its unique circumstances, and because the City Council, in enacting the ordinance that amended the PUD, made an extensive body of factual findings following comprehensive, adversarial hearings. 395 Md. at 40–44, 909 A.2d at 249–51. The Council made its decision "on an individualized basis." *Overpak*, 395 Md. at 41, 909 A.2d at 249. The "property alone was singled out for proposed amendment to its zoning, rather than the entire zoning district or planning area in which it is located." *Id*. In examining "the quality of the proceeding employed to examine the PUD amendment proposal[,]" we pointed out that the City Council complied with State and local enactments that require a hearing so that the parties in interest and the public have an opportunity to voice concerns. *Overpak*, 395 Md. at 41, 909 A.2d at 250. The Court in *Overpak* noted that the City Council undertook an expansive and highly specific fact-

finding process to evaluate the amendment according statutory criteria enumerated in sections 9-112 and 14-205(a) of the Baltimore City Zoning Code. *Overpak*, 395 Md. at 42, 909 A.2d at 250.

We agree with the Court of Special Appeals that, in the present case, the fact that the Resolution pertained to a specific property ostensibly weighs in favor of the conclusion that the PUD approval process was quasi-judicial. The PUD approval process concerned one development project, the approval of which turned on concerns specific to that property. Thus, Resolution 108-11 appears on the surface to satisfy the first factor of the *Overpak* standard that "the act or decision is reached on individual, as opposed to general, grounds, and *scrutinizes a single property*[.]" *Overpak*, 395 Md. at 37, 909 A.2d at 247 (emphasis added). However, in adopting the Resolution, the County Council considered the PUD in a general context, taking into account legislative facts and the impact of the development on the community at large.

Notably, in *Miles Point Prop., LLC*, relying on our decision in *Overpak*, we pointed out that "[i]t is . . . not a hearing's 'mere focus on one parcel that is dispositive of [the hearing's] quasi-judicial nature, but rather that the matter taken up at the hearing is disposed of based on the unique characteristics' of the property at issue." 415 Md. at 387, 2 A.3d at 353. The Court explained that "the greater a decision-maker's reliance on general, 'legislative facts,' the more likely it is that an action is legislative in nature." *Id.* On the other hand we said, "the greater a decision-maker's reliance on property-specific, 'adjudicative facts,' the more reasonable it is to term the action adjudicatory in nature." *Id.* "Generally, adjudicative facts concern questions of 'who did what, where, when, how,

why, [and] with what motive or intent,' while legislative facts 'do not usually concern the immediate parties but are general facts which help the tribunal decide questions of law and policy and discretion." *Miles Point Prop., LLC*, 415 Md. at 387–88, 2 A.3d at 353 (quoting 1 Kenneth C. Davis, *Administrative Law Treatise* § 7:02 (1958)).

There is substantial evidence in the record that the County Council focused minimally on the unique characteristics of the Whalen property itself. Instead, the County Council focused, as directed by BCC § 32-4-242(b)(6), on public policy benefits. Specifically, it focused on the benefits that the PUD would confer to the surrounding community. This is evidenced in the recitals contained in Resolution 108-11:

> [(1) The] project is designed to be a Transit Oriented Development and also meets the objectives of the Baltimore County Master Plan 2020 and "Smart Growth" which the Council approves as an acceptable public policy benefit[;] . . . [(2)] as a community benefit, the building shell of the office building will be constructed to at least a LEED Silver rating, which the Council approves as an environmental benefit . . . [(3)] as a community benefit, the PUD project will provide necessary employment opportunities and services within the Catonsville area, and will promote economic development opportunities [;] . . . [(4)] in addition to the tangible and intangible benefits to the surrounding Catonsville area that would result from the project itself, as a community benefit, the Applicant has made a commitment to make significant traffic safety improvements, including sidewalk improvements to Kenwood Avenue, permanent improvements to the existing intersection of Kenwood Avenue and the ramp to the Baltimore Beltway I-695, and the installation of a permanent traffic signal at the intersection of Kenwood Avenue and Wilkens Avenue, which qualify as capital improvement benefits to County-owned facilities for use by community residents[;] . . .[(5)] the Applicant [is required] to make a commitment to donate the sum of $50,000 to Catonsville Rails to Trials[;] . . . . [(6)] the Applicant [is required] to install improvements to serve the Kenwood Gardens Condominium Association [;] . . . [(7)] the proposed PUD will achieve a development of substantially higher quality than a conventional development will achieve[.]

Thus, considering the County Council's focus in passing Resolution 108-11 there is substantial evidence in the record to support the conclusion that the Council's action in adopting the Resolution was legislative in nature.

Even if we were to characterize the County Council's actions as satisfying the first factor in *Overpak*—and we do not—we agree with the Court of Special Appeals in this case that, "[a]lthough Resolution No. 108-11 clearly addressed a particular parcel of land, in which there was particular community interest, the resolution process lacked the requisite level of fact-finding sufficient to qualify it as a quasi-judicial act under Maryland law." Therefore, the resolution does not satisfy the second factor of the *Overpa*k test which requires a deliberative fact-finding process with testimony and the weighing of evidence. The County Council conducted no adjudicative hearings, nor did it consider documentary evidence or opinion testimony similar to the Baltimore City Council in *Overpak*. 395 Md. at 38, 909 A.2d at 248. The BCC requires a "post-submission community meeting." BCC § 32-4-242(c). Pursuant to the code, Whalen Properties informed interested persons about the PUD and interested community members could "ask questions or make comments." BCC § 32-4-242(c)(1)-(2). Pursuant to the County Code, members of the public may submit "written input and comments" to the Council. BCC § 32-4-242(c)(2)(iii). The limited process here that permitted members of the public to express their views about the PUD was a far cry from the evidentiary hearings that characterized the quasi-judicial proceedings in *Overpak*. 395 Md. at 40–44, 909 A.2d at 249–51. *See also Armstrong v. Mayor & City Council of Balt.*, 169 Md. App. 655, 906 A.2d 415 ("*Armstrong III*") (2006)

(holding that a parking lot ordinance was a quasi-judicial act subject to judicial review due to the adjudicative nature of the hearings held on the matter).

These are not the fact intensive findings as demonstrated in *Overpak*. 395 Md. at 40–44, 909 A.2d at 249–51. At best, the County Council's receipt of public comment and reports concerning the PUD application and its determinations were minimal and preliminary. Here, the Resolution itself is best characterized as conclusory factual assertions requiring little or no factual inquiry. The Resolution consists of the proposed name and location of the PUD, a perfunctory review of the procedural and statutory factors that inform the decision, and a declaration that the proposal meets the objectives of the Baltimore County Master Plan 2020. As the intermediate appellate court stated in its unreported opinion, the County Council's resolution concluded that the PUD was eligible for County review on the basis of information that "[does] not reflect either substantive or fact-intensive review or the weighing of opposing testimonial or physical evidence." The BCC requires that the developer hold a post submission community meeting prior to the adoption of the Resolution so that community residents may provide written input regarding the proposed development. *See* BCC § 32-4-242(c)(2)(ii)(4). The minutes from the community meeting are submitted following introduction of the Resolution. *See* BCC § 32-4-242(c)(2)(ii)(4). While the community meeting may provide opposing testimonial evidence, the record reflects that no mention of review by the Council member was made in the Resolution beyond a note that the minutes were submitted.

The BCC further provides that once the application is submitted, the reviewing agencies must provide to the Council member a preliminary evaluation of the proposal

within fifteen days of the filing. BCC § 32-4-242(c)(3). This review is neither substantive nor fact-intensive; rather, it is a rote determination that the proposed PUD:

1. Generally conforms to the concept plan presented at the community input meeting;
2. Contains the information required under §§ 32-4-221(b) and (c) and 32-4-222 through 32-4-224 of this subtitle; and
3. Complies with other related laws, regulations, or policies.

BCC § 32-4-225 (2016). The preliminary review performed by the reviewing agencies is limited in scope, and does not reflect either substantive review or the weighing of physical evidence beyond comparing the application to the requirements listed in the BCC.

Resolution 108-11 was not the final determination that established that the Whalen Properties PUD would be built. As we previously stated, it was the preliminary finding that opened the door for the "continued review" of the PUD proposal by the County. BCC § 32-4-242(d)(1). This continued review accounted for all the substantive, fact-intensive elements missing from the resolution process. As previously mentioned, the ALJ held a five-day hearing where both sides had an opportunity to present testimony and evidence, including cross-examination and rebuttal arguments. This process culminated in a final conclusion by the ALJ based upon a factual determination on the record and consideration of many statutory and regulatory standards. The ALJ's final decision was subject to further review on appeal to the Board of Appeals. Both the ALJ and the Board of Appeals determined Councilman Quirk's motivations were not within the scope of their review of the PUD application. Similarly, we agree with the determination of the Court of Special Appeals "that the process that culminated in Resolution 108-11 was legislative, and not quasi-judicial, in nature."

- 22 -

Moreover, the courts are not ordinarily "concerned with whatever may have motivated the legislative body." *Workers' Comp. Comm'n v. Driver*, 336 Md. 105, 118, 647 A.2d 96, 103 (1994). "Legislative or quasi-legislative decisions of local legislative bodies are . . . not subject to ordinary judicial review; instead, they are subject to very limited review by the courts." *Overpak*, 395 Md. at 33, 909 A.2d at 245 (quoting *Gisriel v. Ocean City Bd. of Supervisors of Elections*, 345 Md. 477, 490 n. 12, 693 A.2d 757, 763 n. 12 (1997)). Judicial scrutiny of legislative action under the court's ordinary jurisdiction "'is limited to assessing whether [a government body] was acting within its legal boundaries.'"[8] *Miles Point Prop., LLC*, 415 Md. at 393, 2 A.3d at 356 (quoting *Cnty. Council of Prince George's Cnty. v. Offen*, 334 Md. 499, 507, 639 A.2d 1070, 1074 (1994)). *See also Judy v. Schaefer*, 331 Md. 239, 265–66, 627 A.2d 1039, 1052–53 (1993) (noting that when an agency action is legislative in nature, as opposed to adjudicatory or quasi-judicial in nature, the scope of review is limited).

Kenwood seeks the invalidation of Resolution 108-11 and to disqualify Councilman Quirk from the PUD application process, because of the alleged appearance of impropriety

---

[8] The actions of the County Council members are clearly subject to review, for example, by the Ethics Commission, and inquiry into the alleged appearance of impropriety falls under the Commission's purview. *See Sugarloaf Citizens Ass'n, Inc. v. Gudis*, 78 Md. App. 550, 554 A.2d 434 (1989), *aff'd*, 319 Md. 558, 573 A.2d 1325 (1990) (holding that the county ethics commission had primary jurisdiction to hear and investigate any complaint about violations of the ethics code where petitioner alleged that a councilman had violated the county ethics code when voting on a zoning issue); *Bd. of Pub. Works v. K. Hovnanian's Four Seasons at Kent Island, LLC*, 443 Md. 199, 211, 115 A.3d 634, 641 (2015) (noting that a Wetlands Administrator's alleged conflict of interest was referred to State Ethics Commission for review). In addition, Office of the State Prosecutor conducted its investigation and found no basis for criminal charges against a member of the County Council.

in his acceptance of campaign contributions and the submission and approval of the Resolution by the County Council. The process that Councilman Quirk was involved in was legislative and not quasi-judicial or adjudicative.[9] As the Court of Special Appeals indicated in its opinion, "Resolution 108-11 was not the final determination that established whether Whalen Properties' PUD application would be [approved]; rather it was a mere preliminary finding of eligibility that allowed for 'continued review' of the PUD proposal by the County." As long as Councilman Quirk acted within the legal boundaries of the law, his actions were beyond the scope of any extended judicial review. And we agree

[9] In a judicial or quasi-judicial proceeding, the decision-maker is presumed to be impartial. *Regan v. State Bd. of Chiropractic Exam'rs*, 355 Md. 397, 410, 735 A.2d 991, 998 (1999). We have recognized in the context of evaluating the recusal or disqualification of a decision maker or fact finder "that the 'appearance of impropriety' standard set forth in our cases involving judges and some others is applicable generally to the participation of members of Maryland administrative agencies performing quasi-judicial or adjudicatory functions . . . ." *Id*. In such a context, we would apply an objective test to examine the record facts and the law, and decide whether a reasonable person knowing and understanding all the relevant facts would be led to conclude that the decision maker's impartiality might reasonably be questioned. *Regan*, 355 Md. at 410–411, 735 A.2d at 998. The reasonable person standard is applied most often to the actions of judges and lawyers, but it pertains to actions of all public officials. *See, e.g.*, *Spencer v. Md. State Bd. of Pharm.*, 380 Md. 515, 846 A.2d 341 (2004) (members of the Maryland State Board of Pharmacy); *K. Hovnanian's Four Seasons at Kent Island, LLC*, 443 Md. at 211, 115 A.3d at 641 (wetlands administrator); *Regan*, 355 Md. at 410–11, 735 A.2d at 998 (members of the Maryland Board of Chiropractic Examiners); *Sinclair v. State*, 278 Md. 243, 254, 363 A.2d 468, 475 (1976) (prosecutor); *In re Turney*, 311 Md. 246, 253, 533 A.2d 916, 920 (1987) (district court judge). *See also Young v. State*, 297 Md. 286, 298, 465 A.2d 1149, 1155 (1983) (holding "that mere appearance of impropriety is not of itself sufficient to warrant disqualification of entire State's Attorney's office").

The record facts in the present case, however, show that the State Prosecutor was well aware of the allegations of impropriety, but, on the basis of the evidence, never brought criminal charges against the Councilman. To the contrary, the State Prosecutor determined that Councilman Quirk had no express knowledge of the improper donations or that Mr. Whalen had paid them. There were no facts to the contrary made a part of the administrative record.

with the Court of Special Appeals in this case that "[t]he Board of Appeals and the ALJ properly determined that Councilman Quirk's motivations were beyond the scope of review."

Under the circumstances, there is no basis upon which to apply the reasonable person standard[10] to the legislative actions of Councilman Quirk. Neither the Councilman's actions in the PUD application and approval process, nor the County Council's actions amounted to that of a decision maker in a judicial or quasi-judicial proceeding. Thus, both the ALJ and the Board of Appeals were correct in refusing to disqualify Councilman Quirk's or the County Council's participation in the PUD application process.[11]

---

[10] *See supra* note 9.

[11] Additionally, after the oral arguments in the case at bar, Kenwood asked that we review two recent United States Supreme Court cases, *McDonnell v. United States*, 579 U.S. ___ (2016) (No. 474, October Term, 2015) and *Williams v. Pennsylvania*, 579 U.S. ___, 136 S. Ct. 1899, 195 L. Ed. 2d 132 (2016) (No. 5040, October Term, 2015). *McDonnell* is a widely publicized case regarding the former Governor of Virginia, Robert McDonnell, who was convicted of "honest services" fraud and Hobbs Act extortion charges relating to $175,000 in gifts from a businessman. *McDonnell*, 579 U.S. at ___. The Supreme Court vacated McDonnell's convictions on the basis of erroneous jury instructions regarding the definition of "official action." *Id.* The case, however, is distinguishable from the present case as Governor McDonnell was actually charged and convicted of a crime. *Id.* Here, the record reflects no evidence that Councilman Quirk knew the campaign contributions were unlawful or were anything other than independent contributions to his campaign. The Court of Special Appeals noted that no charges were ever brought against Councilman Quirk and there is no evidence of a *quid pro quo* connection between the contributions by the developer and official action taken by the Councilman.

In *Williams v. Pennsylvania*, the Supreme Court held that a Pennsylvania Supreme Court Chief Justice with prior significant involvement in a case as a prosecutor should have recused himself from hearing a post-conviction death penalty appeal on the same case as a judge. 579 U.S. at __, 136 S. Ct. at 1908–10, 195 L. Ed. 2d at 144–46. The judge was one of five justices to hear the appeal and was the author of a concurring opinion, but the Court

Moreover, we decline to apply the conflict-of-interest review urged by Kenwood and used by a minority of states. *See Aldom v. Borough of Roseland*, 127 A.2d 190, 197 (N.J. Supr. Ct. App. Div. 1956); *Netluch v. Mayor & Council of Borough of W. Paterson*, 325 A.2d 517, 520 (N.J. Supr. Ct. Law Div. 1974). Those cases are inconsistent with Maryland law, and we are not persuaded by Kenwood's arguments that we should modify our precedent. In both cases referenced, the Supreme Court of New Jersey addressed the validity of an ordinance when voting members stood to benefit from the passage of the ordinance in question. *Aldom,* 127 A.2d at 196–98; *Netluch*, 325 A.2d at 519–20. The Court concluded that both ordinances were voidable. *Aldom,* 127 A.2d at 198; *Netluch*, 325 A.2d at 520. It was determined that the appearance of impropriety had affected both the legislative act of introducing the resolution and the subsequent quasi-judicial fact finding process. *Aldom*, 127 A.2d at 197. Under Maryland law, however,

> when the judiciary reviews a statute or other governmental enactment, either for validity or to determine the legal effect of the enactment in a particular situation, the judiciary is ordinarily not concerned with whatever may have motivated the legislative body or other governmental actor.

---

held that the impropriety created by the appearance of bias demeaned the reputation and integrity of the court as a whole, and thus constituted reversible error. *Id.*

*Williams* is distinguishable from the present case on the basis of actual impropriety as compared to the alleged appearance of impropriety and *Williams* involved judicial acts, while Councilman Quirk's actions were legislative. *Id.* A judge's failure to recuse himself in a situation where the evidence supports clear and actual impropriety differs from the facts contained in the record of the instant case. *Id.* It was never established that Councilman Quirk was knowingly involved in any wrongdoing. Kenwood merely alleges that the Councilman's actions appeared to be improper, and fails to establish any actual impropriety in his actions in submitting the PUD application to the County Council.

*Driver*, 336 Md. at 118, 647 A.2d at 103. *See also Bethel World Outreach Church v. Montgomery Cnty.*, 184 Md. App. 572, 598 n.17, 967 A.2d 232, 248 n.17 (2009) ("[I]n reviewing legislative action, we refrain from 'institut[ing] an inquiry into the motives of the legislature in the enactment of laws.'") (quoting *Cnty. Council for Montgomery Cnty. v. Dist. Land Corp.*, 274 Md. 691, 704, 337 A.2d 712, 720 (1975)). One commentator points out:

> Judge–made "appearance of fairness" doctrines and special due process standards governing conflicts of interest and bias in adjudicative zoning proceedings generally are not applied to members of a legislative body when engaged in purely legislative zoning actions. The judicial reluctance to review legislative action for bias or conflicts of interest, stems from a concern for the separation of powers and manifests itself in the traditional rule that a court will not inquire into legislators' motives.

2 EDWARD H. ZIEGLER, JR., RATHKOPF'S THE LAW OF ZONING AND PLANNING (4th Ed. Rev. 1994), § 32:15 ("Rathkopf's").

Here, the ALJ decided the merits of Whalen Properties' PUD application. Neither Councilman Quirk nor the County Council participated in the ALJ's decision to approve the PUD or the review conducted by the Board of Appeals. Thus, the Board of Appeals correctly held that it, and the ALJ, lacked the authority and responsibility to review the Resolution for an appearance of impropriety.[12] The standards of review applicable to the

---

[12] The motives of the Legislature do not completely escape review, however. We will review motive "to the extent that a governmental body's motive may cast light upon the meaning of its enactment." *Driver*, 336 Md. at 119, 647 A.2d at 103. *See also Schisler v. State*, 394 Md. 519, 602, 907 A.2d 175, 224 (2006) (acknowledging the Legislature's motives behind an enactment when determining that the Legislature was firing Commissioners, "thus encroaching on the Executive Branch's function"). In the present case, the legislative intent underlying Baltimore County's scheme, pursuant to Article 32,

ALJ and the Board of Appeals do not contemplate scrutiny of the County Council's motives or review for an appearance of impropriety of those motives. *See* BCC § 32-4-245(b) (stating that the ALJ shall review the proposed [PUD] for compliance with the requirements of the Baltimore County Zoning Regulations and the development regulations); BCC § 32-4-281(e) (stating that the Board of Appeals in reviewing the ALJ's determination may reverse or modify the ALJ's decision only under certain circumstances delineated by statute). Applying the above principles and in light of our determination that Resolution 108-11 was legislative in nature, we conclude that the ALJ and the Board of Appeals were not permitted to examine the alleged appearance of impropriety arising from Mr. Whalen's and Councilman Quirk's involvement. And, in any event, as explained above, the process by which the PUD was actually approved was an independent process that did not involve Councilman Quirk or even the County Council.

## Bill 38-12 as a "Special Law"

Lastly, Kenwood alleges that the appearance of impropriety is compounded by the passage of Bill 38-12, the content and timing of which indicate that the primary purpose of the bill was to facilitate approval of Whalen Properties' PUD. Bill 38-12 applies to parcels of land in certain areas of the County and relaxes the compatibility requirement between current land use and proposed future land use. The Bill was voted into law on June 6, 2012, two days before Whalen Properties filed a finalized development plan on June 8, 2012. We reject Petitioners' argument that Bill 38-12, now codified at Article 32, Title 4, Subtitle 4,

---

for evaluating and approving PUDs in that county is not a question we have been asked to address.

§ 32-4-402.1 (2003, 2012 Supp.) of the BCC, is in some way affected by the alleged impropriety and therefore invalid as a "special law."[13] The Court of Special Appeals noted that the Bill was intended to provide alternative compatibility requirements for a specified class of future PUD developments and does not apply solely to the Whalen Properties PUD application. In our view, there is nothing unlawful or improper about the County Council's enactment of Bill 38-12. We agree with the Court of Special Appeals that we cannot reasonably conclude that the law was designed specifically to assist in the passage of this PUD simply because the Bill applied to this PUD application. The record before us does not support Kenwood's conclusions.

## CONCLUSION

The introduction and passage of Resolution 108-11, essentially, were legislative actions, the motivations behind which are not subject to review for the appearance of impropriety. The alleged appearance of impropriety generated by Mr. Whalen's actions did not invalidate Councilman Quirk's or the Council's legislative actions. The preliminary fact-finding review processes carried out by the planning and zoning agencies and the Board of Appeal's substantive review following the passage of the resolution were quasi-judicial actions, which are subject to broader review. Councilman Quirk and the County Council were not involved directly in the proceedings before the ALJ or the Board of Appeals. Any alleged appearance of impropriety involving Councilman Quirk or the County Council would not invalidate the ALJ's decision or the Board of Appeal's decision.

---

[13] *See supra* note 4.

Therefore, we hold that there was substantial evidence in the record to support the Agency's final decision to approve the PUD. That decision was not contrary to the law.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS IS AFFIRMED. COSTS TO BE PAID BY PETITIONERS.**