WV DIA Westminster, LLC v. Mayor & Common Council of Westminster, No. 22, September Term, 2018

**APPLICATION TO AMEND GENERAL DEVELOPMENT PLAN – QUASI-JUDICIAL ACT VS. LEGISLATIVE ACT – JUDICIAL REVIEW – ERROR OF LAW – SUBSTANTIAL EVIDENCE – REMEDY –** Court of Appeals held that Mayor and Common Council of Westminster ("Council")'s decision denying application to amend General Development Plan for Wakefield Valley was quasi-judicial act, not legislative act, because decision was reached on individual grounds involving one parcel through deliberative fact-finding process involving testimony and weighing of evidence; accordingly, decision is subject to judicial review to determine whether substantial evidence in record as whole supports Council's findings and conclusion and to determine whether Council's decision is premised upon error of law. Court of Appeals held that Council was not prohibited from considering, among other things, zonal classification of property when determining whether to grant application. Court of Appeals held that substantial evidence in record as whole supported Council's denial of application. Court of Appeals held that, because it affirmed, it need not determine whether remand or reversal was proper remedy, as neither remedy was applicable.

IN THE COURT OF APPEALS

OF MARYLAND

No. 22

September Term, 2018

————————————————————

WV DIA WESTMINSTER, LLC

v.

MAYOR & COMMON COUNCIL OF
WESTMINSTER

————————————————————

Barbera, C.J.
Greene
*Adkins
McDonald
Watts
Hotten
Battaglia, Lynne A. (Senior
Judge, Specially Assigned),

JJ.

————————————————————

Opinion by Watts, J.

————————————————————

Filed: January 18, 2019

*Adkins, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Md. Constitution, Article IV, Section 3A, she also participated in the decision and adoption of this opinion.

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

This case arises from the denial of an application to amend the General Development Plan for Wakefield Valley ("the Wakefield Valley GDP"), located in the City of Westminster in Carroll County, Maryland. In July 2016, WV DIA Westminster, LLC ("Developer"), Petitioner, filed an application to amend the Wakefield Valley GDP to permit construction of fifty-three homes on what is designated as "Parcel W" of a former golf course ("the Application"). In December 2016, the Mayor and Common Council of Westminster ("the Council"),[1] Respondent, held a public hearing on the Application. In January 2017, the Council held another public hearing to consider whether to approve the Application; at the end of the hearing, the Council voted to deny the Application, and the president of the Council directed staff to prepare a written decision to that effect. In February 2017, Developer filed in the Circuit Court for Carroll County a petition for judicial review. In March 2017, the Council adopted Ordinance No. 876, denying the Application and incorporating an attached written decision, which set forth findings. Developer then filed an amended petition for judicial review.

In July 2017, the circuit court heard argument on the amended petition for judicial review, and held the matter *sub curia* for review of the record. In November 2017, the circuit court issued a memorandum opinion and order, affirming the Council's decision as set forth in Ordinance No. 876. In December 2017, Developer filed a notice of appeal.

---

[1]Section 1 of the Charter of the City of Westminster creates a municipal corporation named "The Mayor and Common Council of Westminster." Section 3 of the Charter of the City of Westminster provides that the government of Westminster "shall be vested in and enforced by" the Mayor and Common Council; in other words, the Mayor and Common Council serve as the governing body for the City of Westminster. We refer to the Mayor and Common Council as "the Council," as opposed to "the City."

While this case was pending in the Court of Special Appeals, Developer filed in this Court a petition for a writ of *certiorari*, which we granted. See <u>WV DIA Westminster v. Mayor & Common Council of Westminster</u>, 459 Md. 401, 187 A.3d 36 (2018).

Against this backdrop, we decide: (I) whether the Council's decision denying the Application was quasi-judicial or legislative in nature; (II) whether the Council erred in considering the zonal classification of Parcel W in evaluating the Application; (III) whether there is substantial evidence in the record as a whole to support the Council's decision; and (IV) if the Council's decision was premised upon an error of law or lacked substantial evidence, whether the appropriate remedy is to reverse and remand the matter with instructions to approve the Application or simply to remand the matter to the Council for further proceedings.

We hold that: (I) the Council's decision denying the Application was a quasi-judicial act, not a legislative act, because the decision was reached on individual grounds involving one parcel through a deliberative fact-finding process involving testimony and the weighing of evidence; accordingly, the decision is subject to judicial review to determine whether substantial evidence in the record as a whole supports the Council's findings and conclusions and to determine whether the Council's decision is premised upon an error of law; (II) the Council was not prohibited from considering, among other things, the zonal classification of Parcel W when determining whether to grant the Application; (III) substantial evidence in the record as a whole supports the Council's denial of the Application; and (IV) because we affirm, holding that there is substantial evidence in the record as a whole to support the Council's findings and conclusions and that the Council's

- 2 -

decision is not premised upon an error of law, we need not determine whether a remand or a reversal is the proper remedy, as neither remedy is applicable.

## BACKGROUND

The Application for amendment of the Wakefield Valley GDP sought to add fifty-three new houses on what is now designated as Parcel W on the Special Purpose Plat Resubdivision of "P" and "Q" Wakefield Valley, recorded in Plat Book 54 on Page 127 among the Land Records of Carroll County. Parcel W comprises 38.2934 acres and is zoned C-Conservation; it is located along the southeastern side of Bell Road, across from Chadwick Drive, with part of the property abutting Fenby Farm Road. The property is part of the Wakefield Valley GDP, approved by the Council in 1978, which addressed the overall development of a number of parcels collectively called Wakefield Valley. With this background in mind, we trace the history of the approval of the Wakefield Valley GDP and subsequent amendments, as well as the adoption of a Zoning Ordinance.

As of 1978, Westminster did not have a Zoning Ordinance. In 1978, the Council approved "[t]he Wakefield Valley/Fenby Farm General Development Plan" for "734.56± acres of land . . . on the western edge of" Westminster, *i.e.*, the Wakefield Valley GDP. The Wakefield Valley GDP consisted of three categories of land use—residential, commercial, and open space—with the "major open space use within the community [to be] a championship golf course." According to the Wakefield Valley GDP, "[a]pproximately 483 ± acres or 66% of the site is devoted to residential, 20± acres or 3% to commercial, and 228± or 31% to open space use." The Wakefield Valley GDP emphasized, however, that "[t]he [c]entral spine of the combined properties is formed by a

- 3 -

flood plain area and a new nine[-]hole golf course[,] which [would] be completed in the early summer of 1978." The Wakefield Valley GDP stated that plans were "underway for the completion of the remaining nine holes" and that "construction of the second nine [would] be based on increased demand and continued development of the residential component of the project." As originally approved, the Wakefield Valley GDP area included twenty-one parcels, designated alphabetically from "A" to "U." According to the Wakefield Valley GDP, the overall gross density was to be 1.6 units per acre, with 31% of open space. And, as originally approved, the Wakefield Valley GDP envisioned a mixed-use development consisting of 670 to 768 residential units on approximately 734 acres, with 20 acres devoted to commercial use.

The following year, in 1979, the Council adopted a Zoning Ordinance, now codified as Chapter 164 of the Code of the City of Westminster ("Westminster Code"). Because a variety of plans were in place before the adoption of the Zoning Ordinance—including the Wakefield Valley GDP—the Zoning Ordinance included a section expressly permitting development to occur based on the existing plans already approved by the Council and providing for amendments to those plans using the process described in an identified provision of the Zoning Ordinance. That section—now codified as Westminster Code § 164-133B—provides, in pertinent part:

> All preliminary plans, final plans, revised preliminary or final plans and all development plans of any type which have been approved by the Mayor and Common Council and/or the Commission prior to November 5, 1979, shall continue to be approved and valid after said date, regardless of the zonal classification of the real property as to which such plans pertain, and said real property shall be developed in accordance with the provisions of such plans. Such plans may be amended in accordance with the procedures provided for

- 4 -

the amendment of development plans contained in § 164-188J of this chapter.

In turn, Westminster Code § 164-188J provides:

> In considering a rezoning application which includes a development plan, the Common Council shall consider whether the application and the development plan fulfill the purposes and requirements set forth in this chapter. In so doing, the Common Council shall make the following specific findings, in addition to any other findings which may be found to be necessary and appropriate to the evaluation of the proposed reclassification:
>
> (1) That the zone applied for is in substantial compliance with the use and density indicated by the Master Plan or sector plan and that it does not conflict with the general plan, the City's capital improvements program or other applicable City plans and policies.
>
> (2) That the proposed development would comply with the purposes, standards and regulations of the zone as set forth in Articles II through XV, would provide for the maximum safety, convenience and amenity of the residents of the development and would be compatible with adjacent development.
>
> (3) That the proposed vehicular and pedestrian circulation systems are adequate and efficient.
>
> (4) That by its design, by minimizing grading and by other means, the proposed development would tend to prevent erosion of the soil and to preserve natural vegetation and other natural features of the site.
>
> (5) That any proposals, including restrictions, agreements or other documents, which show the ownership and method of assuring perpetual maintenance of those areas, if any, that are intended to be used for recreational or other common or other quasi-public purposes, are adequate and sufficient.
>
> (6) That the submitted development plan is in accord with all pertinent statutory requirements and is or is not approved. Disapproval of a development plan by the Common Council shall result in a denial of the rezoning application of which the development plan is a part.

At some point, the golf course acquired additional land to expand from an 18-hole course to a 27-hole course. In 1987, as a result of the acquisition for expansion of the golf

course, the Council approved an amendment to the Wakefield Valley GDP, redistributing the residential density and reconfiguring the golf course. Specifically, the 1987 amendment transferred residential units from the golf course to the parcel known as "Parcel H," resulting in a new allocation of residential units for that parcel.[2] In a letter dated January 16, 1987, Carroll R. Dell, Westminster's then-Director of Planning and Public Works, explained to Dr. Earl Griswold, a landowner, that, in approving the amendment to the Wakefield Valley GDP, "[i]t was noted that the gross residential density within the overall plan has been retained at a maximum of 768 units or approximately 1.45 per acre" and that "[t]he open space has increased to 241.6 acres or 47% of the total tract."

After various changes, the golf course eventually occupied the parcels identified on the original Wakefield Valley GDP as Parcels E, L, M, and T, and part of Parcel G. In 1989, the Council approved a request to amend the Wakefield Valley GDP to reduce the number of residential units for Parcel H.[3] The Council's approval of the requested amendment, however, was subject to certain conditions, including a condition that was originally recommended by the Westminster Planning and Zoning Commission ("the Commission") "[t]hat the approved [GDP] for Wakefield Valley be modified to show a reduction of the [] residential units and ten acres of commercial development on Parcel H."

---

[2]Under the 1978 Wakefield Valley GDP, Parcel H consisted of 7.6 acres and had a residential unit range of 15 to 20 units. Under the 1987 amendment to the Wakefield GDP, Parcel H's acreage and residential unit range increased, with Parcel H consisting of 28.73 acres and having a residential unit range of 167 to 214 units.

[3]The request was to reduce the residential units approved for Parcel H from the maximum of 214, as provided in the 1987 amendment to the Wakefield Valley GDP, to 55.

Under the 1989 amendment to the Wakefield Valley GDP, the overall gross density was to be 1.1 to 1.2 units per acre, with 47% of open space. Thus, from the 1987 amendment to the 1989 amendment, the overall gross density decreased, but the percentage of total area in open space remained the same.[4]

In 2006, Woodhaven Building & Development, Inc. ("Woodhaven") applied to amend the Wakefield Valley GDP to build 320 senior cottages on 167 acres, to be developed on nine holes of the existing 27-hole golf course. Woodhaven's application sought to use density that had been allocated to Parcel H for its development, *i.e.*, to reassign the density that previously existed for Parcel H. The Council denied the proposed amendment, and, in a written decision, the Council noted that Woodhaven had "the burden of proof and persuasion in order to secure approval of an amended development plan[,]" and determined that Woodhaven failed to "produce sufficient credible evidence and testimony to have met its burden of proof to show that all of the [necessary] elements ha[d] been met." The Council acknowledged that Woodhaven had "presented some expert testimony in support of its application[,]" but concluded "that the testimony and evidence was inadequate, incomplete[,] and unpersuasive." The Council concluded:

> [T]he density previously allowed to Parcel H in the prior approved Development Plan terminated and was extinguished by the Council when it acted on an application [for amendment]. As a result, no such units remain available from Parcel H to be reassigned to [Woodhaven]'s proposal. Despite the absence of any dwelling units left available to Parcel H, [Woodhaven] still had the ability to request that the Council amend the Development Plan for its proposal. However, as discussed herein

_____

[4]In 2001, there was another amendment to the Wakefield Valley GDP that established a density of thirteen dwelling units for a parcel owned by Carroll Lutheran Village.

[Woodhaven] did not meet its burden of proof and persuasion. The Council further concluded that the proposed amendment, among other things, was "not in substantial compliance with the use and density indicated by the development plan for Wakefield Valley[,]" was "not compatible with adjacent development[,]" and failed to address serious problems with water supply, traffic, and erosion.

In 2009, the Council adopted a new Comprehensive Plan.[5] Based on a recommendation from the Commission, the zoning for the golf course and undeveloped property in Wakefield Valley was changed from low-density residential zoning to conservation zoning, and the 2009 Comprehensive Plan specifically addressed the Wakefield Valley GDP as follows:

> The 1978 [Wakefield Valley GDP] restricted the development of housing within the parcel where Wakefield Valley Golf Course and Conference Center exists today. However, the current land use is Low Density Residential even though the development plan will not allow any residential homes to be built in this area. The [Commission] recommended a land use change from Low Density Residential to Conservation to reflect the development plan and the existing land use. The existing land use for this parcel is the Wakefield Valley Golf Course and Conference Center surrounded by forest land and natural landscapes as well as a stream that runs from the southwest corner to the eastern portion of the parcel. This change reflects how the land is currently used; however, this change does not change the approved Development Plan for Wakefield Valley. The 2009 Comprehensive Land Use Map has re-designated the land use of this 240 acre parcel from Low Density Residential to Conservation.[6]

---

[5]The following year, in 2010, the Council adopted a Comprehensive Zoning Map.

[6]The 2009 Comprehensive Plan noted that analysis had shown that Westminster "has a limited housing unit capacity of 1,043 dwelling units[,]" and that, "to accommodate the projected population growth for the next 20 years, Westminster will need to increase the housing unit capacity of the City by at least 648 dwelling units." The 2009 Comprehensive Plan observed that, "[a]s of 2009, the City of Westminster had 106 acres of vacant residential land."

- 8 -

At some point, the golf course in Wakefield Valley ceased operations, and, in 2014, Developer purchased the land, comprising approximately 242 acres, and subdivided it into Parcels W, X, Y, and Z.[7]  On June 2, 2014, the Council, Developer, and a company known as Naganwest, LLC, entered into a Memorandum of Understanding ("the MOU").  In the MOU, Developer agreed that it would: procure groundwater appropriation permits; donate certain property in Wakefield Valley to Westminster and Carroll Lutheran Village subject to "retain[ing] any residential density units attributable to, or associated with, the land contributed to" Westminster or Carroll Lutheran Village; and "[s]ubmit an application for the appropriate zoning approvals to allow up to 70 single[-]family residential lots on the Wakefield Valley property[.]"  Developer also agreed that it was "understood that th[e] MOU [was] not intended to limit or restrict the ordinary review authority of the [Council] (or any governmental agency) to impose conditions upon, or deny, the proposed development."  In return, in pertinent part, the Council eliminated two obligations owed by Naganwest, LLC concerning making a $1.5 million water contribution and constructing a pumping station, and agreed to "consider, in good faith, and in accordance with applicable laws and regulations, [Developer]'s application for zoning approvals necessary to allow construction of up to 70 single[-]family lots on the Wakefield Valley property."[8]

By deed dated February 26, 2016, pursuant to the MOU, Developer transferred approximately 188 acres of the golf course property, comprising Parcels Y and Z, to

---

[7]Parcel W is 38.2934 acres; Parcel X is 16.0695 acres; Parcel Y is 171.0747 acres; and Parcel Z is 16.5896 acres.

[8]On May 1, 2015, the Council, Developer, and Naganwest, LLC executed a First Amended MOU, amending a paragraph of the MOU that is not relevant in this case.

Westminster.

On July 21, 2016, Developer filed the Application for amendment to the Wakefield Valley GDP, seeking to build 53 homes on the 38.2934 acres of Parcel W.[9] On September 8, 2016, Developer made an "informal presentation" to the Commission, and Developer and its representative "presented their proposed development and a summary of the [GDP]." In a memorandum dated October 6, 2016, from Bill Mackey, the Planning Director of Westminster, to the Commission, Mackey traced the status of the Wakefield Valley GDP as follows:

> The Decision of the [] Council in 2006 . . . summarizes the process by which the [] Council extinguished 160 density rights in 2016 [sic] . . . . Records indicate that there are remaining unbuilt density rights on land owned by the Griswold family (20 dwelling units), Carroll Lutheran Village (13 dwelling units), Valentine family (two dwelling units), Fenby Farm (one dwelling unit), and two units on the former golf course. It appears that the Durbin House was considered an existing dwelling at one time. Parcels W, X, Y, and Z have two unbuilt rights.

(Paragraph break omitted). According to Mackey, the Application sought "50 new density rights be created for Parcel W" and requested "use of all three existing density rights on the former golf course land (unbuilt plus Durbin)." In a "Conclusion" section, Mackey wrote:

> In the big picture, the subject [Application] is not consistent with the 2009 Comprehensive Plan, nor is it in keeping with the central purpose of the original [Wakefield Valley GDP]. That being said, the 2009 Comprehensive Plan does envision the property as Conservation under the zoning provisions.
>
> If the land were to be developed in line with those provisions, the permitted density would be three units per acre, or roughly a dozen new houses.

---

[9]Parcel X was to be donated to Carroll Lutheran Village, if and when the Council approved the Application.

- 10 -

Utilizing a cluster design approach, this density could be accommodated on 14 acres including a street or plaza. It could allow for community facilities, open space preservation (in order to meet the required 31%), and a uniquely designed setting to provide a special sense of place.

(Italics omitted). And, Mackey advised:

Staff recommends that the Commission consider "approval with recommended modifications," pursuant to [Westminster Code] § 164-188 H. (1), in order to allow nine new density units and transfer the existing three units for a total of 12 density units with the condition that a cluster design be undertaken to maintain a minimum of 24 acres in open space land to preserve the required 31% open space.

One week later, on October 13, 2016, the Commission held a public hearing, at which the Commission considered the Application. At the public hearing, Mackey reviewed his October 6, 2016 memorandum and the staff's recommendation to allow a total of twelve density units for Parcel W. Members of the public also commented, with some individuals raising concerns about traffic and parking, water availability, effects on the open space, and flooding, among other things. The Commission ultimately voted to "leave the record open for 30 days" and asked citizens to submit comments to the Planning Director. On November 17, 2016, the Commission held another public hearing. At that meeting, the Chair noted "that the Commission had received over 100 comments from the public" about the Application. One member of the Commission "reiterated that more support from the community [was] needed." After discussing the Application, the Commission unanimously voted to recommend denial of the Application "as presented."

In a memorandum dated December 7, 2016, Mackey provided the Council with an overview, stating that the Application sought "to add 50 new density rights[,]" and that Westminster staff recommended twelve houses "total, which would reflect the current

- 11 -

zoning, noting that the zoning is not a requirement, since Wakefield Valley is subject to a plan that predates the zoning code." Mackey also advised that over 100 households and organizations had submitted written comments concerning the Application and that thirteen members of the public commented at the Commission's October hearing. Mackey explained that the "Commission recommended denial as presented, citing the extinguishing of development rights in 1989, potential loss of open space, and objections in comments from the public." In the overview, Mackey stated that the Council was "required to utilize a quasi-judicial process to decide on the matter[,]" that the Council was required to "make specific findings in six areas pursuant to [Westminster Code] § 164-188 J.[,]" and that "[d]ocuments and testimony from [Developer], [Westminster] staff, the public and others are considered evidence." In a section titled "Summary Conclusion," Mackey wrote as follows:

> Comparing the historical record with what is actually constructed today, it is evident that there is more open space and less density units than set forth in the original 1978 GDP; however, this is because, over time, more open space was included and less units were allowed in the various re-iterations of the plan.

> \* \* \*

> Regarding open space, [Developer] is correct that there would be 40% open space remaining without Parcel W. However, in 1987[,] the [] Council included 47% for the open space, so open space was increased. At this point, the proposed 40% would be a reduction in open space from the 47% set forth in 1987. That being said, the final build-out of Carroll Lutheran Village could increase the total amount of open space. Also, if Parcel W were to be retained as open space only, then there would be a total of 45% open space. Therefore, unless other parcels were to contribute, the 47% cannot be met.

Mackey also incorporated his October 6, 2016 memorandum, with additional

information and comments, and some deletions.  As to existing density rights available, the modified memorandum noted:

> The three density rights were not assigned to any of the four parcels (Parcels W, X, Y and Z) created by [Developer] out of the former golf course.  The three units first appear in the record for M2 open space parcel in the 1987 revision.  [Westminster] staff had expressed early on that these could be assigned to Parcel W.

(Underlining omitted).  Mackey also modified the October 6, 2016 memorandum to strike two references to the "required 31%" open space.  The modified memorandum recommended "'approval with recommended modifications,' in order to allow nine new density units and transfer the existing three units for a total of 12 density units with the condition that a cluster design be undertaken to maintain as much open space as possible."

On December 12, 2016, the Council held a public hearing on the Application.  At the beginning of the public hearing, an attorney for Westminster recommended that the Council "adopt rules of procedure which you don't presently have for quasi-judicial proceedings."  According to the attorney for Westminster, such rules of procedure had "not been necessary in the past but given the complication of the anticipated hearing[,]" the attorney "thought it would be better if [the Council] adopted local procedure prior to the beginning of the public hearing."  The Council approved and adopted "the rules of procedure for quasi-judicial proceedings as presented."[10]

---

[10]On other occasions during the public hearing, the Council and attorney for Westminster referred to the hearing as "a quasi-judicial" proceeding.  For example, on one occasion, when there was applause, the Council President stated: "Please.  This is a quasi-judicial proceeding.  There will be no outbursts, comments, interruptions, noises, anything from the audience.  Thank you."  And, on another occasion, the attorney for Westminster reminded the Council that the proceeding was "a quasi-judicial hearing" and the Council

- 13 -

Mackey presented Westminster's overview of the Application, and began his testimony by addressing the "quasi-judicial process[.]" Mackey explained:

[A] quasi-judicial process . . . is similar to a courtroom process but it is less formal. Evidence is submitted. People give testimony. It does follow a set of procedures. And after the public hearing[,] the [] Council would make a decision based on findings that they would make in a number of areas, and [the] Council uses the evidence presented during this hearing to support those findings.

As part of this process[,] the Council must make findings in six areas pursuant to [Westminster Code] Subsection 164-188J[.] Those six findings, just to kind of summarize them briefly, [are] whether what is being proposed is consistent with the comprehensive plan, consistent with the zoning Code. If the traffic and pedestrian circulation proposed is acceptable[,] is the preservation of soils and vegetation such as trees, that's number 4, 5 is there maintenance of common facilities being proposed, and does it indeed comply with all statutory requirements or not, and then you make a decision. And that's the process that we're about to undertake this evening. It's a little bit different from the process that the [C]ommission uses which is a recommendation process only.

Mackey provided an overview of the history of Wakefield Valley in general and Parcel W specifically. According to Mackey, in 1987, the Council "increase[d] open space to 47 percent for [] Wakefield Valley . . . because part of the 1987 amendment of Parcel K in Wakefield Valley was swapped for Parcel R in Fenby Farm and that changed the total acreage for both portions of the [GDP] and essentially lowered density in Wakefield Valley." Mackey testified that, in 1989, the Council "reaffirmed" 47% open space, when the Council "extinguished 159 residential density units and 10 acres of commercial [space] as part of an amendment to approve the Fenby Farm subdivision which is actually created

needed "to find facts in such a hearing [and] the witnesses are subject to cross-examination."

- 14 -

from Parcel H in Wakefield Valley and Parcel R in Fenby Farm." As to the current density units of Wakefield Valley, Mackey testified that there were 537 units constructed, ten unused units from various parcels, including three on the former golf course, and fifty-six "raw units for Carroll Lutheran Village[,]" for a total of 603 density units, which Mackey testified "is the lower end of the range of the approval as amended . . . in 1989." As to open space, Mackey "confirm[ed] that the existing open space from all City-owned parcels, from [homeowner association]-owned parcels and Parcel X, if that is indeed turned to open space, for Wakefield Valley and Fenby Farm together is [] 40 percent." Mackey testified, however, that "[i]f Parcel W were to be counted as open space, then there would be 45 percent open space." After being asked by the Council's president whether several more developments had caused the open space to decline from 47% in 1987, Mackey testified: "Well, that I can't really answer. I'm looking across the record, I'm pulling decisions and then we're analyzing what's there."

Mackey testified that Westminster staff recommended twelve density units for Parcel W, and he explained the reasoning behind that based on the history of the Wakefield Valley GDP, relying on Council's 2006 decision, the 2009 Comprehensive Plan, and the 2009 land use map. Mackey testified that Westminster staff "felt that the [Application] presented [was] not consistent with the 2009 comprehensive plan and is not in keeping with the central purpose of the original [GDP]." Mackey explained, though, that, because "the 2009 comprehensive plan does envision the property as conservation in the zoning process there may be a way to find a compromise." According to Mackey, if Parcel W were "developed in line with . . . the conservation zoning provisions, the permitted density

- 15 -

would be theoretically three units per acre[,] . . . yield[ing] about a dozen new houses." And, Mackey suggested that, if Developer used "a cluster design approach[,] that density could be accommodated on a small amount of land, originally 14 acres was suggested, since . . . we sort of teased out open space a little more."

Mackey answered questions from members of the Council. In response to one question, Mackey testified that the Council was "not bound by either [his] recommendation or what [Developer] is suggesting, or what the [C]ommission" recommended, but instead could "come to an independent separate decision." The attorney for Westminster then emphasized that the Council was "not bound by the Staff report" or "by what the [C]ommission did, but [that it had] an application before [it] that [it had] to adjudicate whether it is consistent with those factors in the ordinance." The attorney for Westminster also explained that the Council "could impose conditions on an approval."

Mackey also responded to questions from Developer's counsel. In response to one question, Mackey testified that, from his observations, "it appear[ed] that density was transferred in a variety of cases and in some cases extinguished[,]" and that, "as part of moving things around[,] the exchange back was that open space was increased so things were perhaps concentrated more in order to allow for more open space." Mackey testified that, as proposed, the Application would not be consistent with the 2009 Comprehensive Plan. Mackey also testified that, in his view, the 2009 Comprehensive Plan "recogniz[ed] what [was] existing and also in the context sort of validat[ed] that that is the desire of [Westminster] for such property[,]" and "also include[d] some intent as well." In response to a question from Developer's counsel as to whether the Council "should consider changes

- 16 -

that have occurred in the area since 1978 in considering" the Application, Mackey testified: "If it relates to or bears upon a finding, then if there's evidence on the record that relates to a finding that would be something that they could consider." Shortly thereafter, Mackey finished testifying, and Developer began to present its case.

Developer called five experts to testify about the Application. Edmund Cueman, whom the Council accepted as an expert in land use planning and design, testified that, from 1962 to 1971, he was the Planning Director for Worcester County, and, from 1971 to 1995, he was the Planning Director for Carroll County. According to Cueman, as the Planning Director for Carroll County, he recalled when the Wakefield Valley GDP was developed, reviewed, and approved in 1978. In 1978, in his capacity as Planning Director, Cueman wrote a letter to Dell, the then-Director of Public Works and Planning, in which he commented on the Wakefield Valley GDP and discussed the overall density goal. Cueman testified that, based on his review of the Application, his familiarity with the property, the Wakefield Valley GDP, and the amendments, his investigation, and his review of the Zoning Ordinance, the Application was in substantial compliance with the use and density indicated by the Wakefield Valley GDP.

Martin Hackett, the president of a local consulting firm that handled engineering, land planning, and surveying, was accepted by the Council on its own motion as an expert in land design; one member of the Council referred to Hackett as "one of the most qualified individuals in Carroll County." Hackett testified that he worked with Developer on the Application, and he opined that the Application was in substantial compliance with the use and density indicated by the Wakefield Valley GDP. According to Hackett, because the

Wakefield Valley GDP predated the Zoning Ordinance, "conventional zoning, just conventional Euclidian zone for properties out there, the zonal classification is not relevant." Hackett also testified that density in the Wakefield Valley GDP area fluctuated over time, stating: "People have decreased density, they've shifted density, whatever, certainly you can increase density as well . . . as long as you meet the criteria outlined in" Westminster Code § 164-188J. Hackett testified that that approval of the Application would result in less density per acre and more acres of open space than under the 1978 Wakefield Valley GDP. Specifically, according to Hackett, the 1978 Wakefield Valley GDP envisioned a density of 1.6 dwelling units per acre, the density was 1.18 dwelling units per acre in 1989, and, if the additional units in the Application were approved, the density would be 1.27 dwelling units per acre. And, Hackett testified that, based on his calculations, under the 1978 Wakefield Valley GDP, there were approximately 200 acres of open space; at the time of the hearing, there were 242 acres of open space; and, if the Application were approved, there would be 208 acres of open space.

According to Hackett, the Application was compatible with the Wakefield Valley GDP and surrounding development. Hackett testified that the Application did not have the water problems associated with the proposed 2006 amendment to the Wakefield Valley GDP. Hackett testified that the Application also met all the standards for pedestrian circulation, internal roads, grading, erosion, and sewers. Hackett explained that his investigation and preparation of the Application included 3D imaging. Hackett further testified that the Application helped satisfy the 2009 Comprehensive Plan's call for more dwelling units, and he opined that the Application was in substantial compliance with the

Wakefield Valley GDP and met all relevant criteria.

Brian Biddle, the vice-president of a traffic consulting business, was accepted by the Council as an expert in traffic, and testified that he conducted a traffic study for the Application. Biddle opined that the Application complied with all traffic standards. Lisa Eckard, a certified general real estate appraiser, was accepted by the Council as an expert in real estate appraisal. Eckard opined that, if approved, the Application would not negatively affect property values in the area, and she opined that the Application was compatible with surrounding development. And, Melanie Moser, a registered landscape architect, was accepted by the Council as an expert in land use planning and design. Moser testified that the Application substantially complied with the use and density indicated by Wakefield Valley GDP, had an adequate erosion-prevention plan, and was compatible with the 2009 Comprehensive Plan.

The Council heard from citizens who urged the Council to deny the Application. Thereafter, the Council adjourned the hearing.

On January 9, 2017, the Council conducted another hearing to consider the Application. At the outset of the hearing, Mackey stated: "[T]he community ha[s] been alerted to the fact that the public hearing has been closed and that this hearing is for your deliberation and discussion of the matter." One member of the Council advised that, "[b]ecause this was a quasi-judicial hearing we were prohibited from discussing this amongst ourselves[.]" The Council President sought to clarify the procedure with which the Council was to deliberate the necessary criteria and make a decision, and the attorney for Westminster explained that, generally, "that occurs as a consequence of a discussion

and debate about each of your views of the application of these six criteria to the facts that were adduced before you in the hearing last month."

The Council then discussed and debated the six factors set forth in Westminster Code § 164-188J.[11]  The Council voted that the Application failed to satisfy Westminster Code § 164-188J(1)—substantial compliance with the use and density indicated by Master Plan or sector plan, *i.e.*, the Wakefield Valley GDP, and that it did not conflict with the general plan, the City's capital improvements program, or other applicable City plans and policies.  The Council further voted that the Application complied with Westminster Code § 164-188J(2) through (5), and that Westminster Code § 164-188J(6) was irrelevant and generally not applicable.[12]  Thus, because one of the factors was not satisfied, the Council

---

[11]As stated above, Mackey was present at the hearing while the Council deliberated. During the hearing, members of the Council asked Mackey questions.  The attorney for Westminster reminded the Council that it had "to decide based on the record that was before" it, but stated that she did not "have a problem" with Mackey conveying some information that was already contained in the record.  At a certain point, Developer's counsel objected, stating: "The hearing is over.  You're entitled to deliberate.  You're not entitled to take additional evidence. . . . [W]e are in a quasi-judicial process where you are supposed to make a decision based on the facts that were put into the record[.]"  Later, a member of the Council stated:

> I think we all ought to make sure and be reflective of the fact that we're making our decision based on all the information we heard during the hearing phase as well as the public input phase and not anything that was said this evening by [] Mackey.  I think we understand that we have to put that out of our mind because clearly that probably isn't completely in compliance with the quasi-judicial hearing aspect of what we're required to do here.

The other members of the Council agreed.

[12]With respect to the sixth factor, the minutes of the January 9, 2017 hearing stated that one member of the Council "shared that the sixth factor all goes back to the first factor," and that "the Council found factor[] . . . six to fail."

voted to deny the Application, and "direct[ed] Staff to . . . generate an opinion based on [its] deliberations and the considered decisions of the elected officials."

One month later, on February 9, 2017, before the Council issued a written decision, Developer filed in the circuit court a petition for judicial review of the Council's oral decision at the January 9, 2017 hearing denying the Application.

A month after that, on March 13, 2017, the Council adopted Ordinance No. 876, denying the Application and incorporating an attached written decision, which set forth findings. The same day, the Mayor approved Ordinance No. 876. Ordinance No. 876 stated, in pertinent part, that the Council had "determined that the [A]pplication [did] not meet[] the criteria set forth in [Westminster Code] § 164-188J[,]" and that the Mayor and the Council intended "to act unfavorably upon the [A]pplication[.]" Accordingly, Ordinance No. 876 stated that the Application was "denied for the reasons set forth in the accompanying decision attached hereto as Exhibit A."

The Council's written decision described the Application, Westminster's adoption of the Zoning Ordinance and the criteria of Westminster Code § 164-188J, the history of the Wakefield Valley GDP, and the adoption of the 2009 Comprehensive Plan. In the decision, the Council also discussed relevant law, stating:

> [Developer] at no point requested rezoning of the property. [The A]pplication was, therefore, for permission to develop residential units on the property in excess of the number of such units previously allotted to the parcel that is currently in [Developer]'s ownership, notwithstanding the existing zoning for the property, based upon an analysis of the history, circumstances and residential unit allocations conferred upon the entire Wakefield Valley GDP area. . . . There is a strong presumption of correctness attaching to a comprehensive rezoning because it is a legislative function[.]

Even though the present matter impacts directly only a small part of the Wakefield Valley G[DP] area, it is analogous to *Potomac Valley League v. [] County Council [for Montgomery County]*, 43 Md. App. 56[,] 61[, 403 A.2d 388, 391-92] (1979)[,] in which the [C]ourt said that the Montgomery County Council had validly approved a comprehensive zoning, even though it involved only four parcels totaling 1.39 acres. The Court reasoned that the subject zoning was a culmination of a prior comprehensive zoning approved in 1974 and partially implement[ed] in a 1970 master plan.

With respect to the Application, in the decision, the Council explained its reasons for "disapprov[ing] the proposed amendment to the Wakefield Valley" GDP, stating:

> The open space requirement for the Wakefield [Valley] GDP area is 47%. As development presently stands, the actual open space in the Wakefield Valley GDP area is 45%, including an undeveloped Parcel W. If Parcel W were to be developed in accordance with the [Application for] the proposed Fourth Amendment, the open space would be 40%.

> The Council finds that the [Application] is not in substantial compliance with the use and density indicated by the master plan or sector plan and that it conflicts with the general plan, City's capital improvement program or other applicable City plans and policies.

> The language of [Westminster Code §] 164-133(B), which as counsel for [Developer] pointed out, apparently applies only to the property originally included in the Wakefield Valley [GDP] and to no other property in the City, indicates that the subject property is not the same as other parts of the City in terms of how the zoning evolved and how the plan for this property has progressed. The trajectory of past decisions has generally been to reduce the number of lots allocated to these parcels all across the area and generally increase the proportion of open space relative to residential space. The proposed plan does not fit into that trajectory and that sort of long range view of what Wakefield Valley is supposed to look like, not because it is residential development but because of the density of it.

> The residential density that is permissible in the Conservation zone is one unit per three acres, or 12 units for a 38-acre parcel. While the [] Council acknowledges that the development of the property is not strictly bound by the zonal classification, it finds that the Conservation zone designation of the subject property is useful guidance with respect to the City's vision for the area. The [Application] varies from the type of density suggested by the zoning by a material and substantial amount for which the Council finds no

- 22 -

justification in the evidence presented to it.

The Council specifically does not decide, in connection with the [A]pplication, that there is no possible proposal for residential density above one unit for three acres that [] it might find to be consistent with its vision for the Wakefield Valley [GDP] area. The Council notes that it does not view the Conservation zoning of the property as dispositive of the appropriate density, but is merely a guideline and consideration for a decision with respect to whether the [A]pplication before it is appropriate for approval. [The] Council accepts the observations of planning staff that, if the land were to be developed in accordance with the density permitted in the Conservation zone, a cluster design approach could be accommodated on 14 acres including the street or plaza, allowing for community facilities, open space preservation[,] and a uniquely designed setting to provide a special sense [of] place.

The Council concludes that there was no evidence that the [Application] does not satisfy the criteria of [Westminster Code] § 164-188(J)(2)-(5) or the requirement of (J)(6) that the proposal be otherwise in accord with pertinent statutory requirements.

In accordance with [Westminster Code] § 164-188, the Council is permitted to make "any other findings which may be found to be necessary and appropriate to the evaluation of the proposed reclassification." As it did in 2006, the Council recognizes the unfavorable recommendations advanced by its staff and [the] Commission, and incorporates those recommendations by reference. The [] Council finds that the medium density residential development proposed by [Developer] for this particular parcel will not serve the public interests of the residents of the City in retaining the low-density character of the Wakefield Valley general area. Much of the surrounding area is developed with larger lot residential subdivisions. While [the] Council acknowledges that some of the surrounding communities are constructed upon smaller lots, it notes the observation of Planning Staff that those communities would not likely meet the requirements of the City's current design development guidelines.

On March 16, 2017, Developer filed an amended petition for judicial review "for the sole purpose of including the written decision of the" Council.

The parties filed in the circuit court memoranda of law addressing, among other things, whether there was substantial evidence in the record to support the Council's

determination that the Application was not in substantial compliance with the use and density indicated by the Wakefield Valley GDP. On July 6, 2017, the circuit court heard argument on the amended petition for judicial review and held the matter *sub curia* for review of the record. On November 17, 2017, the circuit court issued a memorandum opinion and order, affirming the Council's decision as set forth in Ordinance No. 876 and concluding that "[t]he record as a whole show[ed] that the Council afforded [Developer] due process, deliberated appropriately[,] and supported its denial with substantial evidence." In relevant part, the circuit court determined that the Council's actions were quasi-judicial, and thus "subject to review by the substantial evidence test[,]" and that there was substantial evidence in the record supporting the Council's denial of the Application.

On December 19, 2017, Developer filed a notice of appeal. On May 4, 2018, while this case was pending in the Court of Special Appeals, Developer filed in this Court a petition for a writ of *certiorari*, raising the following four issues:

1. When a local government conducts a quasi-judicial hearing and vote, can it prevent judicial review by recasting its ultimate written decision as legislative in nature?

2. Does the phrase "regardless of zonal classification" in Westminster Code § 164-133B permit use of zonal classification as a guideline?

3. Does Westminster Code § 164-188J(1) permit the Council to rely on an informal trend that is not part of "the general plan, the City's capital improvements program or other applicable City plans and policies"?

4. Is the proper remedy vacatur or outright reversal?

On June 1, 2018, before the Court of Special Appeals issued an opinion, this Court granted the petition. See WV DIA Westminster, 459 Md. 401, 187 A.3d 36.

- 24 -

**STANDARD OF REVIEW**

In <u>Kenwood Gardens Condos., Inc. v. Whalen Props., LLC</u>, 449 Md. 313, 324-25, 144 A.3d 647, 654-55 (2016), this Court set forth the standard of review applicable to an administrative agency's final decision, stating:

> In reviewing the final decision of an administrative agency, . . . we look through the circuit court's . . . decision[], although applying the same standards of review, and evaluate the decision of the agency. Our scope of review is narrow and is limited to determining whether there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law. We defer to the regulatory body's fact-finding and inferences, provided they are supported by evidence which a reasonable person could accept as adequately supporting a conclusion. However, if we determine that the agency's decision is based on an erroneous conclusion of law, no deference is given to those conclusions.

(Cleaned up).

## DISCUSSION

### I. Quasi-Judicial Act vs. Legislative Act

### The Parties' Contentions

Developer contends that the Council's decision denying the Application was a quasi-judicial decision, not a legislative act. Developer argues that quasi-judicial review requires examination of a parcel on individual grounds, utilizing a deliberative and testimonial fact-finding process. Developer asserts that the findings required by Westminster Code § 164-188J are the types of findings made by a governmental body during a quasi-judicial decision-making process. According to Developer, the Council's actions with respect to Parcel W, *i.e.*, the Application, were quasi-judicial, which the Council emphasized during testimony and deliberations. For example, Developer points

- 25 -

out that witnesses testified under oath, the Council accepted certain witnesses as experts, the Council permitted cross-examination of witnesses, and the Council cited the quasi-judicial standard during its deliberations and voting. Developer maintains that, by casting its decision as an exercise of legislative judgment, the Council applied an erroneous standard and thus legally erred, and Developer contends that the Council cannot now ask that this Court affirm its decision on the basis that the decision was a quasi-judicial decision supported by substantial evidence.

As an initial matter, the Council responds that, whether the nature of its decision was legislative or quasi-judicial, it performed its responsibility correctly. The Council contends, however, that the proposed amendment to the Wakefield Valley GDP was a legislative act akin to comprehensive zoning, and that, as a legislative act, the Council's decision enjoys a strong presumption of correctness subject to very limited judicial review. According to the Council, the Wakefield Valley GDP served as comprehensive zoning, or a mini-master plan, and, although the Application did not seek piecemeal zoning, the Council used the procedures applicable to piecemeal zoning to evaluate the necessary statutory factors. The Council argues that the circumstance that the Application affected only a portion of the Wakefield Valley GDP does not transform it from a legislative act into a quasi-judicial act. The Council asserts that the Application would have impacted the entire Wakefield Valley GDP area by diminishing the open space. The Council maintains that it did not err in conducting a public hearing that followed a quasi-judicial process and then issuing its decision as a legislative act, *i.e.*, Ordinance No. 876.

**Relevant Law**

Land use decisions by a local governmental body are categorized as either legislative or quasi-judicial in nature. See Md. Overpak Corp. v. Mayor and City Council of Balt., 395 Md. 16, 32-33, 909 A.2d 235, 244-45 (2006). Whether a governmental action is legislative or quasi-judicial in nature is significant because it dictates the scope of judicial review. See id. at 33, 909 A.2d at 245. Specifically, "legislative actions are subjected to a more limited review by the courts than are quasi-judicial actions[.]" Id. at 33, 909 A.2d at 245 (citation omitted). In Kenwood, 449 Md. at 338, 144 A.3d at 662, we explained that legislative actions of local governmental bodies "are not subject to ordinary judicial review[,]" and are instead "subject to very limited review by the courts." (Cleaned up). Indeed, "[j]udicial scrutiny of legislative action under the court's ordinary jurisdiction is limited to assessing whether a government body was acting within its legal boundaries." Id. at 338, 144 A.3d at 663 (cleaned up). By contrast, quasi-judicial actions are reviewed to determine "whether there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine [whether] the administrative decision is premised upon an erroneous conclusion of law." Id. at 325, 344, 144 A.3d at 654-55, 666 (cleaned up).

When a question arises as to whether a governmental body's decision is legislative or quasi-judicial in nature "[i]n the land use and zoning context, the essential questions to be asked are: what property or properties are being examined, for what reason, and at whose behest?" Overpak, 395 Md. at 37, 909 A.2d at 247. To that end, this Court has developed a "standard for determining whether an act is legislative or quasi-judicial in nature[,]"

which we recently reiterated in Kenwood, 449 Md. at 332, 144 A.3d at 659, stating:

> The outcome of the analysis of whether a given act is quasi-judicial in nature is guided by two criteria: (1) the act or decision is reached on individual, as opposed to general, grounds, and scrutinizes a single property; and (2) there is a deliberative fact-finding process with testimony and the weighing of evidence.

(Quoting Overpak, 395 Md. at 33, 909 A.2d at 245). With respect to the first factor, "ordinarily, proceedings or acts that scrutinize individual parcels or assemblages for the consideration of property-specific proposed uses, at the owner's or developer's initiative, suggest a quasi-judicial process or act." Kenwood, 449 Md. at 332, 144 A.3d at 659 (cleaned up). These types of "individualized determinations are" distinguishable "from acts that primarily have broader, community-wide implications, which encompass considerations affecting the entire planning or zoning district." Id. at 332-33, 144 A.3d at 659 (cleaned up). As to the second factor, in Kenwood, id. at 333, 144 A.3d at 659, we explained:

> The second element of the test ordinarily involves the holding of a hearing, the receipt of factual and opinion testimony and forms of documentary evidence, and a particularized conclusion as to the development proposal for the parcel in question. Accordingly, site-specific findings of fact are necessary not only to inform properly the interested parties of the grounds for the body's decision, but also to provide a basis upon which judicial review may be rendered. We [have] pointed out . . . that the most weighty criterion is the fact-finding.

(Cleaned up).

This Court has consistently stated that comprehensive zoning is a legislative act. See, e.g., Anne Arundel Cty. v. Bell, 442 Md. 539, 553, 113 A.3d 639, 647 (2015) ("Comprehensive zoning is fundamentally legislative and no significant quasi-judicial

- 28 -

function is involved. As comprehensive zoning encompasses a large geographical area, the process is initiated generally by a local government, rather than by a property owner or owners." (Cleaned up)); <u>Anderson House, LLC v. Mayor and City Council of Rockville</u>, 402 Md. 689, 723, 939 A.2d 116, 136 (2008) ("Comprehensive rezoning is a vital legislative function, and[,] in making zoning decisions during the comprehensive rezoning process, a zoning authority is exercising what has been described as its plenary legislative power." (Cleaned up)); <u>Nottingham Village, Inc. v. Balt. Cty.</u>, 266 Md. 339, 354, 292 A.2d 680, 687 (1972) ("Zoning or rezoning in accordance with a comprehensive plan is a legislative function[.]" (Cleaned up)).

By contrast, this Court has stated that piecemeal zoning is a quasi-judicial action. For example, in <u>Bell</u>, 442 Md. at 555, 113 A.3d at 648-49, we explained:

> Piecemeal zoning is accomplished by local zoning authorities through a quasi-judicial process. Notably, the act or decision reached through this quasi-judicial process is on individual, as opposed to general, grounds, and scrutinizes a single property. The piecemeal zoning process is decidedly un-legislative in nature, except at the end: it includes typically a deliberative fact-finding process, which entails the holding of at least one evidentiary hearing (generally), factual and opinion testimony, documentary evidence, cross-examination of the witnesses, and objections to the weighing of evidence. This process results in a particularized set of written findings of fact and conclusions of law as to the zoning proposal for the parcel or assemblage in question.

(Cleaned up). In <u>Bell</u>, <u>id.</u> at 553, 113 A.3d at 647, we succinctly summarized the distinction between the two types of zoning in terms of whether the act is legislative or quasi-judicial in nature, stating: "Original and comprehensive zoning are accomplished solely through legislative processes culminating in legislative acts, while piecemeal rezoning is achieved through a quasi-judicial process leading to a technical legislative act." (Cleaned up).

In Overpak, 395 Md. at 22-23, 44, 909 A.2d at 238-39, 251, this Court held that the Mayor and City Council of Baltimore's process for granting an industrial planned unit development ("PUD") and subsequently approving a PUD amendment proposal was quasi-judicial in nature. In concluding as much, we explained that the City Council's consideration of the PUD amendment proposal at issue, which later became the subject of an ordinance signed by the Mayor, "was evaluated on both individual and general grounds[,]" stating:

> [T]he [City] Council's decisions to grant both [the] original request to designate [certain property] as an Industrial PUD and each of the three subsequent substantive amendments to the approved PUD were made upon grounds focused on a development plan for that plot of land only, and thus was considered on an individualized basis. This property alone was singled out for proposed amendment of its zoning, rather than the entire zoning district or planning area in which it is located. This individualized action was precisely the kind of change, focusing on the particulars involved with a specific property and its unique circumstances, contemplated by our previous cases as quasi-judicial in nature.

Id. at 40-41, 909 A.2d at 249 (citations omitted). We also highlighted the process used to examine the PUD amendment proposal, which included the holding of a hearing, the requirement that certain findings of fact be made, and the use of specific standards applied to those facts. See id. at 41, 909 A.2d at 250.

We ultimately concluded "that the process for the approval of PUDs, and substantive amendments thereto, in Baltimore City is [] quasi-judicial character, rather than legislative in nature," explaining:

> It should also be noted that concurrent with this hearing and referral process, the [City] Council examined, and ultimately approved, the development plan, which is required to address thirteen separate considerations affecting the site of the proposed PUD or any substantive

amendment to an approved PUD. The gravamen of these standards and the inquiry surrounding them is a detailed and thorough examination of the unique circumstances of a specific PUD proposal for a specific parcel, including the potential for adverse impacts on adjacent properties. This process of receiving evidence and creating a record upon which the City Council then must rely in deciding the ultimate question of whether the development plan, or amended plan, should be granted is quite analogous to the quasi-judicial processes analyzed in [two other cases]. In both of those cases, as was done here, findings of fact were made based on reports from governmental agencies and departments and a public hearing, wherefrom the final governmental decision-maker drew its findings as to the pending matter affecting a particular piece of property.

Id. at 43-44, 909 A.2d at 251 (cleaned up).

On the other hand, in Kenwood, 449 Md. at 332, 144 A.3d at 659, this Court held that, within the Baltimore County Council's PUD-review process, "a preliminary finding of eligibility that allowed for the continued review of the PUD proposal by [Baltimore] County[,]" as embodied in a resolution, "was a legislative act in nature premised on a threadbare recital of relevant facts as submitted by the developer and evaluated on general, policy-based grounds." We acknowledged that, on the surface, the resolution appeared to be quasi-judicial in nature because it pertained to a particular property, and the PUD approval process concerned only "one development project, the approval of which turned on concerns specific to that property." Id. at 334, 144 A.3d at 660. Nevertheless, we noted that, in adopting the resolution, the Baltimore County Council "considered the PUD in a general context, taking into account legislative facts and the impact of the development on the community at large." Id. at 334, 144 A.3d at 660. We observed that the Baltimore County Council focused only "minimally on the unique characteristics of the" property at issue, and instead focused largely "on public policy benefits" and, specifically, "the

benefits that the PUD would confer to the surrounding community." Id. at 334-35, 144 A.3d at 660. Thus, we concluded that the Baltimore County Council's action in adopting the resolution was legislative, not quasi-judicial, in nature. See id. at 335, 144 A.3d at 661.

We further explained that, even if the first factor of the test to determine whether an action is quasi-judicial in nature were satisfied, the second factor was not satisfied because the Baltimore "County Council conducted no adjudicative hearings, nor did it consider documentary evidence or opinion testimony similar to the Baltimore City Council in *Overpak*, 395 Md. at 38, 909 A.2d at 248." Kenwood, 449 Md. at 336, 144 A.3d at 661. Indeed, the only process involved the developer informing interested persons about the PUD, and then those persons could ask questions, make comments, or submit written comments to the Baltimore County Council. See id. at 336, 144 A.3d at 661. We explained that that "limited process [] that permitted members of the public to express their views about the PUD was a far cry from the evidentiary hearings that characterized the quasi-judicial proceedings in *Overpak*, 395 Md. at 40-44, 909 A.2d at 249-51." Id. at 336, 144 A.3d at 661 (citation omitted).

**Analysis**

In this case, in agreement with Developer, we hold that the Council's decision in denying the Application was quasi-judicial, not legislative, in nature, and, as such, is subject to judicial review to determine whether substantial evidence in the record as a whole supports the Council's findings and conclusions and to determine whether the Council's decision is premised upon an error of law. See Kenwood, 449 Md. at 325, 344, 144 A.3d at 654-55, 666. We conclude that the Council's decision in denying the

Application satisfies the two-part test for determining whether a given action was quasi-judicial in nature because it was reached on individual, as opposed to general, grounds, involving one parcel—Parcel W—and the decision was reached through a deliberative fact-finding process involving testimony and the weighing of evidence.  See id. at 332, 144 A.3d at 659.

We begin our analysis with the first criterion of the two-part test we reiterated in Kenwood, id. at 332, 144 A.3d at 659, namely, whether "the act or decision is reached on individual, as opposed to general, grounds, and scrutinizes a single property[.]"  (Citation omitted).  Here, contrary to the Council's contention, it is evident that the Council reached its decision based on an examination of Parcel W on individual grounds, and is more akin to piecemeal rezoning than comprehensive rezoning.  As this Court has stated, comprehensive zoning or rezoning is usually initiated by a local government—not a property owner or developer—and encompasses a large geographic area.  See Bell, 442 Md. at 553, 113 A.3d at 647.  Piecemeal rezoning, on the other hand, involves scrutiny of a single property, and typically involves a deliberative fact-finding process, which generally consists of, among other things, holding an evidentiary hearing, receiving factual and opinion testimony and documentary evidence, and setting forth particularized written findings of fact and conclusions of law.  See id. at 555, 113 A.3d at 648-49.  In this case, Developer initiated the process by filing the Application seeking to amend the Wakefield Valley GDP; *i.e.*, the Council did not initiate the amendment process.  Moreover, the Application sought to amend the Wakefield Valley GDP only with respect to Parcel W, which comprises 38.2934 acres of the approximately 734.56 acres that make up the

Wakefield Valley GDP area. In other words, the Application did not encompass a large geographic area, let alone the majority or entirety of the Wakefield Valley GDP area. And, the process utilized by the Council in considering the Application certainly included all of the hallmarks of a deliberative fact-finding process, such as the holding of an evidentiary hearing and the receipt of factual and opinion testimony, as well as documentary evidence.

As we stated in Kenwood, 449 Md. at 332, 144 A.3d at 659, "ordinarily, proceedings or acts that scrutinize individual parcels . . . for the consideration of property-specific proposed uses, at the . . . developer's initiative, suggest a quasi-judicial process or act." (Cleaned up). The process by which the Application was filed and considered strongly suggests a quasi-judicial process because it: (1) involved scrutiny of one particular parcel—Parcel W; (2) for consideration of property-specific uses—the addition of 53 new homes on Parcel W; (3) at Developer's initiative—Developer filed the Application. That the Application could possibly have had an impact on the entire Wakefield Valley GDP area, by affecting the open space or otherwise, does not mean that the Council's decision was reached on general grounds, as opposed to individual grounds scrutinizing a single property. Indeed, deciding whether to grant or deny the Application necessarily involved scrutiny of Parcel W. Thus, the first part of the test strongly suggests that the Council's decision was quasi-judicial in nature.

As to the second part of the test to determine whether an action is quasi-judicial in nature—i.e., whether "there is a deliberative fact-finding process with testimony and the weighing of evidence[,]" id. at 332, 144 A.3d at 659 (citation omitted)—the process utilized in this case resulting in the adoption of Ordinance No. 876 and the incorporated

written decision of the Council undeniably was a deliberative fact-finding process involving testimony and the weighing of evidence. As we have noted, of the two criteria to determine whether an action is quasi-judicial, the fact-finding process is "the most weighty criterion[.]" id. at 333, 144 A.3d at 659 (quoting Overpak, 395 Md. at 33, 909 A.2d at 245). The deliberative fact-finding process utilized in this case involved all of the trademarks that we have identified as being ordinarily involved in such a process, including the holding of an evidentiary hearing, the receipt of factual and opinion testimony, the receipt of documentary evidence, and a particularized conclusion as to the development proposed for a particular parcel. See Kenwood, 449 Md. at 333, 144 A.3d at 659.

In this case, in considering the Application, the Council used a deliberative and testimonial fact-finding process. Importantly, the specific findings required by Westminster Code § 164-188J—including, among other things, whether an application substantially complies with the use and density indicated by the Master Plan or sector plan and does not conflict with other specified plans and policies, whether the proposed vehicular and pedestrian circulation systems are adequate and efficient, and whether the proposed development tends to prevent erosion of the soil and to preserve natural vegetation and other natural features of the site—are precisely the types of findings that a governmental body must make during a quasi-judicial decision-making process involving proposed development on a particular property.

And, we observe that, notably, throughout the process—indeed, until the adoption of Ordinance No. 876 and the incorporated written decision of the Council—both Developer and the Council treated the process as quasi-judicial in nature. On December

- 35 -

12, 2016, the Council held a public hearing on the Application. At the beginning of the hearing, the attorney for Westminster recommended that the Council adopt rules of procedure applicable to quasi-judicial proceedings, which the Council approved and adopted. Witnesses were sworn and testified under oath at the hearing, and were subject to cross-examination. During Mackey's testimony, he discussed the quasi-judicial process and the Council's role in that process. During the hearing, the Council's President and attorney for Westminster referred to the hearing as a "quasi-judicial proceeding" and "quasi-judicial hearing[,]" respectively. And, the Council accepted certain witnesses as experts, and received numerous documents as evidence. At the second hearing on January 9, 2017, the Council again cited the quasi-judicial standard, and clarified with the attorney for Westminster the process by which it was to deliberate and make a decision. And, at the end of the hearing, when the Council was voting, one member of the Council reminded the others that they were required to conduct a "quasi-judicial hearing[.]" In short, throughout the process, from the filing of the Application to the Council's deliberation and oral fact-finding and voting, both parties treated the process as quasi-judicial.

We further observe that the deliberative fact-finding process utilized by the Council to consider the Application is similar to the process used in Overpak, 395 Md. at 22-23, 44, 909 A.2d at 238-39, 251, to approve a PUD amendment proposal, which we concluded was quasi-judicial in nature. As in Overpak, id. at 40-44, 909 A.2d at 249-51, among other things, the process in this case involved individualized consideration of a particular property, and not simply consideration of an entire planning area in which the property was located; holding a hearing; a statutory requirement to make certain findings of fact; use of

- 36 -

specific standards applied to those facts; the receipt of evidence and creation of a record on which the Council was required to rely in deciding whether to approve the Application; and finding facts based on reports from governmental agencies and departments and a public hearing.

By contrast, the deliberative fact-finding process in this case is vastly different from the preliminary finding of eligibility that this Court concluded was a legislative act in Kenwood, 449 Md. at 332, 144 A.3d at 659. For example, in Kenwood, id. at 336, 144 A.3d at 661, the process involved was "limited" and only "permitted members of the public to express their views about the PUD[.]" Indeed, this Court characterized that process as being "a far cry from the evidentiary hearings that characterized the quasi-judicial proceedings in *Overpak*[.]" Kenwood, 449 Md. at 336, 144 A.3d at 661. Clearly, in this case, the process of the hearing, taking of testimony and documentary evidence, deliberating, and voting, cannot be said to have been a limited process.

Despite the proceeding before the Council meeting both criteria of the test to qualify as a quasi-judicial act, the Council persists in arguing that its decision was a legislative act. We are simply unpersuaded. As an initial matter, the circumstance that the Council issued its written decision in the form of an ordinance that incorporates a written decision is a red herring. We note that, in Overpak, 395 Md. at 22-23, 44, 909 A.2d at 238-39, 251, the Mayor and City Council of Baltimore approved and adopted by ordinance an amendment to an approved PUD, yet this Court nevertheless concluded that the process for approving substantive amendments to PUDs in Baltimore City was quasi-judicial in nature. Thus, that the Council approved Ordinance No. 876 and incorporated its written decision therein

- 37 -

does not transform the process or the Council's decision into a legislative one. Indeed, the Council cannot escape judicial review of its decision pursuant to the substantial evidence test simply by characterizing its decision as an exercise of legislative judgment and, thus, a legislative act.

In any event, that the Council claims that its action was legislative in nature does not make it so. Nor does it necessitate an automatic reversal where, throughout the process, the deliberations, and the vote and decision itself, the Council treated the matter as a quasi-judicial one and acted accordingly. Indeed, perhaps, as the Council suggests on brief, its confusion can be explained by the circumstance that, because the Wakefield Valley GDP predates the Zoning Ordinance, the Wakefield Valley GDP operates like comprehensive zoning, *i.e.*, a legislative act, whereas the provisions of the Zoning Ordinance provide that amendments to the Wakefield Valley GDP are to be governed by standards applicable to piecemeal zoning, *i.e.*, a quasi-judicial act. Notwithstanding how the Council labels its act and the source of its apparent confusion, the record clearly demonstrates that the process utilized to consider and ultimately deny the Application was quasi-judicial in nature. Thus, having concluded that the Council's decision in denying the Application was quasi-judicial, not legislative, in nature, and that there was no error of law in that regard, the Council's decision, like any other quasi-judicial decision, is subject to judicial review to determine whether substantial evidence in the record as a whole supports the Council's findings and conclusions and to determine whether the Council's decision is premised upon an error of law. See Kenwood, 449 Md. at 325, 344, 144 A.3d at 654-55, 666.

## II. Consideration of Zonal Classification

### The Parties' Contentions

Developer contends that the Council erred in its application of Westminster Code § 164-133B, which requires, in pertinent part, that the Wakefield Valley GDP "shall continue to be approved and valid . . . regardless of the zonal classification of the real property as to which such plans pertain[.]" Developer argues that the phrase "regardless of" means "without taking into account." Developer asserts that the Council erred by using zoning as a guideline, and by suggesting that compliance with the conservation zoning of Parcel W was required. Developer maintains that, because the meaning of "regardless of" is unambiguous, the Council should not have considered Parcel W's zonal classification, as it was not a permissible guideline.

The Council responds that it correctly interpreted and applied Westminster Code § 164-133B. The Council contends that it could consider the 2009 Comprehensive Plan as well as development that occurred in the Wakefield Valley area between 1978 and 2016. The Council asserts that Westminster Code § 164-133B makes clear that zonal classification does not affect the ability to develop property based on the 1978 Wakefield Valley GDP, prior to the adoption of the Zoning Ordinance. The Council maintains, however, that amendments to the Wakefield Valley GDP involve its discretion and require it to consider the overall area. The Council contends that Westminster Code § 164-188J, referenced by Westminster Code § 164-133B, further directs it to make any other necessary and appropriate findings, which, in turn, allows it to consider the passage of time, other amendments to the Wakefield Valley GDP, and the 2009 Comprehensive Plan. In other

words, the Council argues that it was not strictly limited to considering only the six factors identified by Westminster Code § 164-188J in considering the Application.

## Relevant Law

Westminster Code § 164-133B provides, in its entirety:

All preliminary plans, final plans, revised preliminary or final plans and all development plans of any type which have been approved by the Mayor and Common Council and/or the Commission prior to November 5, 1979, shall continue to be approved and valid after said date, **regardless of the zonal classification of the real property as to which such plans pertain**, and said real property shall be developed in accordance with the provisions of such plans. Such plans may be amended in accordance with the procedures provided for the amendment of development plans contained in § 164-188J of this chapter. Additionally, the Common Council may amend any such plans approved prior to November 5, 1979, to permit residential single-family attached dwellings in lieu of any commercial or business use, provided that it determines, after an opportunity for public comment, that there will be no increase in the gross allowable residential density beyond that originally approved and that such development will not have an adverse impact upon the adjacent properties or the general character of the approved development plan.

(Emphasis added). In turn, Westminster Code § 164-188J provides in its entirety:

In considering a rezoning application which includes a development plan, the Common Council shall consider whether the application and the development plan fulfill the purposes and requirements set forth in this chapter. In so doing, the Common Council shall make the following specific findings, in addition to any other findings which may be found to be necessary and appropriate to the evaluation of the proposed reclassification:

(1) That the zone applied for is in substantial compliance with the use and density indicated by the Master Plan or sector plan and that it does not conflict with the general plan, the City's capital improvements program or other applicable City plans and policies.

(2) That the proposed development would comply with the purposes, standards and regulations of the zone as set forth in Articles II through XV, would provide for the maximum safety, convenience and amenity of the residents of the development and would be compatible with adjacent

development.

(3) That the proposed vehicular and pedestrian circulation systems are adequate and efficient.

(4) That by its design, by minimizing grading and by other means, the proposed development would tend to prevent erosion of the soil and to preserve natural vegetation and other natural features of the site.

(5) That any proposals, including restrictions, agreements or other documents, which show the ownership and method of assuring perpetual maintenance of those areas, if any, that are intended to be used for recreational or other common or other quasi-public purposes, are adequate and sufficient.

(6) That the submitted development plan is in accord with all pertinent statutory requirements and is or is not approved. Disapproval of a development plan by the Common Council shall result in a denial of the rezoning application of which the development plan is a part.

**Analysis**

Here, we conclude that, by its plain language, Westminster Code § 164-133B does not prohibit the Council from considering, among other things, the zoning classification of a property when determining whether to grant an application to amend a GDP. As discussed above, the Wakefield Valley GDP was approved in 1978, prior to the existence of a Zoning Ordinance in Westminster. In 1979, the Council adopted the Zoning Ordinance. To account for the various plans that were in place before the adoption of the Zoning Ordinance—including the Wakefield Valley GDP—the Zoning Ordinance included Westminster Code § 164-133B, which expressly permits development to occur based on the existing plans already approved by the Council. To that end, Westminster Code § 164-133B provides, in relevant part, that all development plans approved "prior to November 5, 1979, shall continue to be approved and valid after said date, regardless of

- 41 -

the zonal classification of the real property as to which such plans pertain, and said real property shall be developed in accordance with the provisions of such plans." Westminster Code § 164-133B made clear that, regardless of whatever zoning classification was designated for property, pre-existing development plans would still be approved and valid, and property would still be required to be developed in accordance with those development plans. In other words, when the sentence is read as a whole, it plainly shows that zonal classification does not affect the ability to develop property in accordance with an approved development plan that existed prior to the adoption of the Zoning Ordinance.

Westminster Code § 164-133B simply does not state that, in considering an amendment to a development plan, the Council is prohibited from considering the zonal classification of the property at issue. Developer misreads Westminster Code § 164-133B by taking the phrase "regardless of the zonal classification of the real property" out of context. When read as a whole, the section is clear—pre-existing approved development plans would continue to be valid after adoption of the Zoning Ordinance, regardless of the zonal classification of the property encompassed by those plans; *i.e.*, zonal classification of property would not affect the validity of a development plan approved prior to adoption of the Zoning Ordinance and the ability to develop property in accordance with the provisions of that development plan. The section does not state, let alone mean, that the Council must consider amendments to development plans that occur after adoption of the Zoning Ordinance without regard for the zonal classification of the property at issue.

Indeed, with respect to amendments to development plans, Westminster Code § 164-133B provides that "[s]uch plans may be amended in accordance with the procedures

provided for the amendment of development plans contained in" Westminster Code § 164-188J. And, Westminster Code § 164-133B provides that, if the Council "determines, after an opportunity for public comment, that there will be no increase in the gross allowable residential density beyond that originally approved and that such development will not have an adverse impact upon the adjacent properties or the general character of the approved development plan[,]" then the Council may amend a development plan "to permit residential single-family attached dwellings in lieu of any commercial or business use[.]" As such, with respect to amendments of development plans where an owner or developer seeks to develop residential single-family attached dwellings in lieu of any commercial or business use, Westminster Code § 164-133B explicitly states that the Council "may amend" for such a purpose, "provided that" the Council determines that there will not be an increase in gross allowable residential density beyond that originally approved, and that there will not be an adverse impact upon adjacent properties or the general character of the development plan; *i.e.*, the Council is specifically directed to consider the originally approved gross allowable residential density, adjacent properties, and the character of development plan as a whole. And, significantly, Westminster Code § 164-133B speaks of amendments to development plans using the term "may"—that "[s]uch plans may be amended" and that the "Council may amend[.]" The use of the permissive word "may" reflects the discretion afforded to the Council when reviewing an application to amend a development plan.

Additionally, Westminster Code § 164-133B incorporates the entirety of Westminster Code § 164-188J, and directs that development plans may be amended in

- 43 -

accordance with the procedures therein. Westminster Code § 164-188J provides, in pertinent part, that the Council must make specific findings with respect to six factors, as well as "any other findings which may be found to be necessary and appropriate to the evaluation of the" application to amend the development plan. The phrase "any other findings" is broad, and is limited only to those findings that the Council deems "to be necessary and appropriate" in evaluating an application to amend a development plan, thus vesting the Council with the discretion to determine which findings are "necessary and appropriate[.]" Thus, in evaluating an application to amend a development plan, the Council has the discretion and authority pursuant to Westminster Code §§ 164-133B and 164-188J to make any findings that are "necessary and appropriate[.]" Plainly, the Council may determine that necessary and appropriate findings include such things as the zonal classification of the property under the applicable comprehensive plan, the history and development that has occurred in a development plan area over the years, and other amendments approved for the development plan.

In short, in considering the Application in this case, the Council was not limited to consideration of the six factors set forth in Westminster Code § 164-188J and nothing else. Rather, in accord with Westminster Code § 164-188J, in considering an application to amend a GDP, the Council could make "any other findings which may be found to be necessary and appropriate to the evaluation[,]" and nothing in Westminster Code § 164-133B prohibited the Council from considering the zonal classification of Parcel W. Thus, we conclude that the Council did not legally err in considering, among other things, the conservation zoning designation of Parcel W in evaluating the Application.

- 44 -

**The Parties' Contentions**

Developer contends that, under the Council's factual findings, the Application satisfied Westminster Code § 164-188J. As such, Developer argues that the Council's rejection of the Application was legal error and there was not substantial evidence to support it. Developer points out that the Council found that all relevant considerations of Westminster Code § 164-188J(2) through (5) were satisfied, and that (6) was not relevant, thus binding the Council as to those matters. As to Westminster Code § 164-188J(1), Developer asserts that the "trend" relied on by the Council to deny the Application was not a "plan or policy" as contemplated by Westminster Code § 164-188J(1), but instead was an aspect of the Council's erroneous reliance on zonal classification. According to Developer, the applicable Westminster policy, as evidenced in the 2009 Comprehensive Plan, is to direct and encourage residential development, such that the Council's conclusion with respect to Westminster Code § 164-188J(1) lacked substantial evidence. Developer maintains that the Application complied with the 1978 Wakefield Valley GDP, and is consistent with the 2009 Comprehensive Plan.

The Council responds that it properly exercised its authority to deny the Application, and that the record contains substantial evidence supporting its findings of fact and its conclusion that the Application did not satisfy the criteria of Westminster Code § 164-188J. The Council contends that the evidence in the record, including the prior amendments to the Wakefield Valley GDP and the 2009 Comprehensive Plan, demonstrated that the density of the area had been reduced and open space generally

- 45 -

increased. According to the Council, the Application and its requested proposed medium density "did not fit with the long-range view of Wakefield Valley." The Council argues that, although there was no evidence that the Application did not satisfy several of the necessary statutory factors, the Application did not substantially comply with the use and density indicated by the Wakefield Valley GDP. The Council asserts that, in considering the Application, it also properly considered the 2009 Comprehensive Plan, which recommended conservation zoning for the property, thereby reiterating the open space intent for the area. The Council maintains that Developer simply failed to meet its burden of persuasion to show that the Application complied with the use and density indicated by the Wakefield Valley GDP. The Council contends that, because one factor was not satisfied, it properly denied the Application.

## Relevant Law

"Once [a] court determines [] that the administrative agency applied the proper standards prescribed by the statute at issue, judicial review of the agency's conclusion is then tested by the substantial evidence test." Montgomery Cty. v. Buckman, 333 Md. 516, 519 n.1, 636 A.2d 448, 450 n.1 (1994) (cleaned up). "In applying the substantial evidence test, a reviewing court decides whether a reasoning mind reasonably could have reached the factual conclusion the agency reached." Donlon v. Montgomery Cty. Pub. Schs., 460 Md. 62, 74, 188 A.3d 949, 956 (2018) (cleaned up). Moreover, "[a] reviewing court should defer to the agency's fact-finding and drawing of inferences if they are supported by the record[,]" and the "reviewing court must review the agency's decision in the light most favorable to it; the agency's decision is prima facie correct and presumed valid, and it is

the agency's province to resolve conflicting evidence and to draw inferences from that evidence." Id. at 74, 188 A.3d at 956 (cleaned up).

In relevant part—and at issue in this case—Westminster Code § 164-188J(1) provides that the Council must make the following specific finding, "in addition to any other findings which may be found to be necessary and appropriate to the evaluation of the proposed reclassification:" "That the zone applied for is in substantial compliance with the use and density indicated by the Master Plan or sector plan and that it does not conflict with the general plan, the City's capital improvements program or other applicable City plans and policies."

**Analysis**

Having determined that the Council's decision denying the Application is not premised upon an error of law, we turn to whether there is substantial evidence in the record as a whole to support the Council's findings and conclusions. We hold that there is substantial evidence supporting the Council's decision and, specifically, its determination that the Application failed to satisfy Westminster Code § 164-188J(1)—"That the zone applied for is in substantial compliance with the use and density indicated by the Master Plan or sector plan and that it does not conflict with the general plan, the City's capital improvements program or other applicable City plans and policies." Indeed, given the evidence in the record and applying the substantial evidence test, we conclude that "a reasoning mind reasonably could have reached the factual conclusion the [Council] reached[,]" Donlon, 460 Md. at 74, 188 A.3d at 956 (cleaned up)—namely, that the Application failed to substantially comply with the use and density indicated by the

- 47 -

Wakefield Valley GDP, as amended over the years, and that it conflicts with the general plan or other applicable City plans and policies.

As an initial matter, we note that Westminster Code § 164-188J(2) through (6) are not at issue. At the hearing on January 9, 2017, the Council voted that the Application complied with Westminster Code § 164-188J(2) through (5), and that Westminster Code § 164-188J(6) was irrelevant and generally not applicable. In its written decision attached to Ordinance No. 876, "[t]he Council conclud[ed] that there was no evidence that the [Application did] not satisfy the criteria of [Westminster Code] § 164-188(J)(2)-(5) or the requirement of (J)(6) that the proposal be otherwise in accord with pertinent statutory requirements." Thus, in essence, the parties agree that the Application satisfied Westminster Code § 164-188J(2) through (6), and substantial evidence in the record as a whole supports those findings, including the testimony of experts who testified on Developer's behalf.

Thus, our focus is on Westminster Code § 164-188J(1). In its written decision, the Council explained that the Application failed to satisfy this subsection for several reasons, including: (1) the open space requirement for the Wakefield Valley GDP area is 47%, and approving the Application would result in 40% open space; (2) "[t]he trajectory of past decisions has generally been to reduce the number of lots allocated to the[] parcels all across the area and generally increase the proportion of open space relative to residential space[,]" and the Application failed to "fit into that trajectory" due to the proposed density; (3) the density proposed in the Application varied from the density permissible to property zoned conservation; and (4) the density proposed by the Application would not serve to

- 48 -

"retain[] the low-density character of the Wakefield Valley area." Substantial evidence in the record as a whole supports the Council's findings and its determination that the Application did not substantially comply with the use and density indicated by the Wakefield Valley GDP.

The record contains the following evidence supporting the Council's findings. When the Wakefield Valley GDP was adopted in 1978, the open space requirement was set at 31%. The 1978 Wakefield Valley GDP specifically provided that "[a]pproximately 483 ± acres or 66% of the site is devoted to residential, 20± acres or 3% to commercial, and 228± or 31% to open space use." And, the "major open space use within the community" was to be "a championship golf course." As to overall gross density, the 1978 Wakefield Valley GDP provided for a residential unit range of 670 to 768, and overall gross density was to be 1.6 units per acre.

In 1987, the Council approved an amendment to the Wakefield Valley GDP, redistributing residential density and reconfiguring the golf course. Specifically, the 1987 amendment transferred residential units from the golf course to Parcel H, resulting in a new allocation of residential units for Parcel H and increasing the acreage of that parcel. The maximum allowable residential units for the Wakefield Valley GDP area remained the same, at 768 units; the overall gross density was approximately 1.45 units per acre; and the open space increased to 47%. In 1989, the Council approved an amendment to the Wakefield Valley GDP to reduce the maximum number of residential units for Parcel H from 214 to 55. Approval of the amendment was conditioned on showing "a reduction of the [] residential units and ten acres of commercial development on Parcel H." Under the

1989 amendment, the overall gross density was set at 1.1 to 1.2 units per acre, with 47% open space. At some point, the open space decreased to 45%.

In 2006, the Council denied an application to amend the Wakefield Valley GDP that sought to permit Woodhaven to build 320 senior cottages on 167 acres. Woodhaven had sought to reassign the density that previously existed for Parcel H, and the Council rejected that approach, explaining that the density previously allowed to Parcel H had been terminated and extinguished, and, thus, there were no residential units available from Parcel H to be reassigned to Woodhaven. In other words, the Council denied an amendment that would have increased density.

According to Mackey's memorandum to the Council, in 1987, the open space for the Wakefield Valley GDP area was increased to 47%, and the total open space would be 45% if Parcel W were to remain undeveloped, or 40% if the Application were approved and Parcel W developed. In other words, according to Mackey, approving the Application would result in a decrease of the open space. At the hearing, Mackey testified that, currently, Wakefield Valley consists of a total of 603 density units, which, according to Mackey, "is the lower end of the range of the approval as amended . . . in 1989." Moreover, Mackey testified extensively as to why the Westminster staff's recommendation was to deny the Application as proposed.

This evidence in the record demonstrates that, from the time that it was first approved in 1978 to the present, the Wakefield Valley GDP has been amended in ways that generally reduce the density and increase the open space. In 1978, the open space

requirement for the Wakefield Valley GDP area was 31%, but, in 1987, the open space requirement was increased to 47%, where it has remained as part of the goal of the Wakefield Valley GDP. As development presently stands, the actual open space in the area is 45%, which includes the open space of Parcel W if it remains undeveloped. If the Application were to be approved, however, and Developer were to build the 53 single-family homes proposed on Parcel W, then the open space would drop to 40%, which is contrary to the intent for the area as demonstrated through the amendments to the Wakefield Valley GDP. In short, the record provides substantial evidence supporting the Council's findings with respect to open space and the trajectory of the Wakefield Valley GDP area to decrease density and increase open space. Moreover, the same evidence demonstrates that the Wakefield Valley GDP has historically been an area of low-density residential use and a generous open space requirement.

As to the zonal classification, in 2009, the Council adopted a new Comprehensive Plan, and the zoning for the golf course and undeveloped property located in Wakefield Valley was changed from low-density residential zoning to conservation zoning. The 2009 Comprehensive Plan specifically addressed the Wakefield Valley GDP, and noted that the change in zoning was to "reflect the development plan and the existing land use." Mackey testified that, under conservation zoning provisions, the permitted density would be three units per acre, meaning that Parcel W could yield a dozen new houses, not fifty-three as proposed. This evidence supports the Council's finding that the density proposed in the Application varied from the density permissible to property that is zoned conservation, and

that the zonal classification serves as "useful guidance with respect to the City's vision for the area."

By relying on the circumstance that the Application may have complied with the 1978 Wakefield Valley GDP, Developer ignores the various amendments approved by the Council over the years, including amendments that significantly altered the density and open space requirements for the area. The Council properly considered those amendments in determining that the Application was not in substantial compliance with the use and density indicated by the Wakefield Valley GDP, and substantial evidence supports the Council's findings and decision. Because the Council determined that the Application failed to satisfy all of the factors set forth in Westminster Code § 164-188J, it properly denied the Application.

## IV. Remedy

The parties differ about the appropriate remedy. Developer contends that the appropriate remedy in this case to reverse and remand the matter with instructions to grant the Application. The Council responds that, if this Court determines that an error of law occurred, a remand for further proceedings is the appropriate remedy in this case, not reversal.

Because we conclude that there is substantial evidence in the record as a whole to support the Council's findings and conclusions, and that the Council's decision is not premised upon an error of law, we affirm the circuit court's judgment, which, in turn, affirmed the Council's decision denying the Application, as set forth in Ordinance No. 876.

Accordingly, we need not determine whether a remand or a reversal is the proper remedy

in this case, as neither remedy is applicable under the circumstances.

**JUDGMENT OF THE CIRCUIT COURT FOR CARROLL COUNTY AFFIRMED. PETITIONER TO PAY COSTS.**